

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) ) ) | No. 72849-1-I |
| v. | ) ) | PUBLISHED OPINION |
| SANTIAGO ORTUNO-PEREZ, | ) ) | |
| Appellant. | ) ) ) | FILED: November 28, 2016 |

DWYER, J. — Following a jury trial, Santiago Ortuno-Perez was convicted of murder in the second degree, committed while armed with a firearm. Ortuno-Perez's planned defense was that another person who was armed at the scene—Austin Agnish—committed the charged offense. Prior to trial, Ortuno-Perez sought permission from the trial court to identify Agnish to the jury as the killer, to cross-examine the State's witnesses for bias in their testimony, and to introduce additional evidence indicating that a person other than Ortuno-Perez committed the murder. The trial court excluded the evidence and later clarified that Ortuno-Perez was precluded from arguing that anyone else at the murder scene committed the crime, notwithstanding that the evidence proffered by Ortuno-Perez tended to logically connect Agnish to the killing and notwithstanding that, as the trial evidence made clear, the victim was slain at

close range by someone at the scene. The trial court erred by so ruling.

The trial court's "other suspect" rulings were not harmless. The rulings prevented Ortuno-Perez from offering evidence at trial tending to show that Agnish was the true killer and from advancing the defense theory that the State's eyewitnesses presented biased, contradictory, and untruthful testimony. Furthermore, the rulings effectively reduced Ortuno-Perez's trial defense to shallow cross-examinations of the State's witnesses. Without the ability to draw meaningful conclusions from the evidence actually admitted at trial and assert that someone other than him fired the fatal shot, Ortuno-Perez's general denial defense, in the face of undisputed evidence that the victim was shot by someone standing nearby, effectively amounted to either a nonsensical claim that the shooting did not happen or a meek suggestion that the State somehow failed to prove its case. Unsurprisingly, this defense was unsuccessful. As the trial played out, the trial court's "other suspect" rulings deprived Ortuno-Perez of his right to present a defense. Accordingly, we reverse and remand for a new trial.

I

In the early morning hours of October 12, 2013, Jesus Castro was shot in the head while standing outside of a house in Renton. He died several days later.

The single shot was fired at close range from a .22 caliber firearm. At the time the shot was fired, anywhere between 5 to 12 people were standing in close proximity to Castro. In that group were 2 individuals particularly pertinent here, Santiago Ortuno-Perez and Austin Agnish—each of whom was armed with a

handgun at the time.

On the same day that Castro was shot, Ortuno-Perez was identified as a suspect and subsequently arrested outside of a house in Kent. While conducting a search of Ortuno-Perez's jacket after his arrest, the police found a .22 caliber bullet in the left outside breast pocket. The bullet, although of the same caliber as the bullet that killed Castro, was not of the same style and could have been from a different manufacturer. The weapon that was used to murder Castro was never found.

In a search of the house outside of which Ortuno-Perez was arrested, the police seized clothing similar to that which Ortuno-Perez was described as wearing at the time of the shooting. This clothing was tested for traces of blood but none was found.

In the days that followed, Ortuno-Perez was identified as the shooter by several witnesses who were present at the scene, including Agnish, Zachary Parks, and Dechas Blue.

Ortuno-Perez was subsequently charged with one count of murder in the first degree, committed while armed with a firearm.

Prior to trial, the State indicated that it would rely on the testimony of Agnish, Parks, Blue, and another witness, Joey Perdoza, to present evidence adverse to Ortuno-Perez. These witnesses were either acquaintances or close friends of one another. The State further intended to call another eyewitness, Castro's girlfriend, Erika Lazcano—with whom Castro had a child—to testify against Ortuno-Perez.

- 3 -

Crucial to his defense at trial, Ortuno-Perez sought to introduce evidence that another person, not him, killed Castro. In particular, his counsel sought to identify Austin Agnish as the shooter, to cross-examine the State's witnesses for potential bias in their testimony, and to present additional evidence indicating that a person other than Ortuno-Perez was the shooter. The trial court denied Ortuno-Perez's request because Ortuno-Perez had not demonstrated that Agnish had taken steps to commit the crime.

Four days later, Ortuno-Perez's counsel filed a detailed offer of proof regarding the "other suspect" evidence that the defense would have introduced but for the trial court's adverse ruling. At a hearing that same day, Ortuno-Perez's counsel attempted to clarify the scope of the trial court's evidentiary ruling, asking whether it included questions on cross-examination seeking to reveal witnesses' biases and additional evidence implying the existence of a shooter who was not Ortuno-Perez. The trial court indicated that such questions and other evidence were indeed excluded, stating that,

> [THE COURT]: . . . [O]ther suspect [evidence], really, is about pointing the finger to a specific other person or persons. And that's what the Court has indicated you may not do in this case.
> [DEFENSE COUNSEL]: So even saying – I will drop it after this – saying anyone else at that scene could have committed this crime, is that pointing the finger at somebody?
> [THE COURT]: Basically yes.

At trial, the State argued that Ortuno-Perez killed Castro. The State's presentation of its case made clear that one of the individuals standing near Castro fired the fatal shot. In particular, the State offered a medical expert's testimony that, at the time of the gunshot, the barrel of the murder weapon was

between two inches and two feet from Castro's head.

Agnish, Parks, Blue, and Perdoza testified adversely to Ortuno-Perez. Agnish, Parks, and Perdoza attested to being reluctant to testify at trial, claiming that they had received death threats for testifying in the case. Lazcano also testified against Ortuno-Perez, identifying him in court as the shooter, notwithstanding her prior statements to the police immediately after the incident in which she was unable to identify who shot Castro.

On the 10th day of testimony, after the State presented its last witness, Ortuno-Perez moved for a mistrial, arguing that his right to present a defense had been denied by the trial court's "other suspect" rulings. Specifically, Ortuno-Perez argued that, in addition to being unable to present any evidence that tended to connect Agnish to Castro's murder, the rulings prevented him from being able to effectively confront the State's witnesses based on their testimony at trial. The trial court denied the motion. Immediately thereafter, the State and Ortuno-Perez rested their cases. Ortuno-Perez did not testify.

The jury convicted Ortuno-Perez of murder in the second degree, committed while armed with a firearm. He was sentenced to 280 months of confinement.

Ortuno-Perez now appeals.

II

A

Over the course of nearly a century and an intervening United States Supreme Court decision, Washington's "other suspect" evidence rule—applicable

to proffered evidence that a specific person other than the defendant committed the charged crime—has developed from a broad common law rule to a specific and focused application of well established principles of materiality and probative value.

In State v. Downs, 168 Wash. 664, 13 P.2d 1 (1932), our Supreme Court acknowledged the common law rule. The issue in Downs was whether the trial court improperly excluded evidence that a specific person other than Downs or his codefendant committed the burglary at issue. The defendants sought to present evidence that "Madison Jimmy," a well known safe burglar, was in town on the night in question and planned to argue to the jury that he, not the defendants, stole from the safe. Downs, 168 Wash. at 666. Upon the State's objection, the trial court excluded the evidence. Downs, 168 Wash. at 666. Our Supreme Court found no error in the trial court's ruling. Noting that the defendants had failed to adduce evidence pointing to "Madison Jimmy" as the burglar, the court cited to the "general rule" of other jurisdictions, requiring that "[b]efore such testimony can be received, there must be such proof of connection with the crime, such a train of facts or circumstances as tend clearly to point out someone besides the accused as the guilty party." Downs, 168 Wash. at 667 (citing State v. Caviness, 40 Idaho 500, 235 P. 890 (1925)). The court concluded that "[t]he fact that the so-called 'Madison Jimmy' was present in Seattle on the night of the burglary and may have had the opportunity to commit it, does not amount to even a justifiable suspicion that he did so." Downs, 168 Wash. at 667-68. The proffered evidence, the court observed, "would not create a reasonable

- 6 -

inference as to the innocence of appellants." Downs, 168 Wash. at 668.

Nearly 70 years later, the United States Supreme Court examined whether a recent modification to South Carolina's common law "other suspect" evidence rule deprived a defendant of his right to present a defense. Holmes v. South Carolina, 547 U.S. 319, 327, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006).[1] The modified South Carolina rule excluded more evidence than did the common law rule, permitting a trial court to exclude a defendant's "other suspect" evidence when there was sufficiently strong evidence of the defendant's guilt.

> Under this rule, the trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt. Instead, the critical inquiry concerns the strength of the prosecution's case: If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues.

Holmes, 547 U.S. at 329.

The Supreme Court noted the manner in which the common law "other suspect" rule was consistent with constitutional mandates.

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. See, e.g., Fed. Rule Evid. 403; Uniform Rule of Evid. 45 (1953); ALI, Model Code of Evidence Rule 303 (1942); 3 J. Wigmore, Evidence §§ 1863, 1904 (1904). Plainly referring to rules of this type, we have stated that the Constitution

---

[1] South Carolina's prior "widely accepted" common law rule was the same rule discussed in Downs and followed in subsequent Washington cases. Holmes, 547 U.S. at 327 n.* (citing State v. Thomas, 150 Wn.2d 821, 856-58, 83 P.3d 970 (2004)); see Downs, 168 Wash. at 667.

permits judges "to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" Crane[ v. Kentucky], 476 U.S.[ 683,] 689-690[, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)] (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679[, 106 S. Ct. 1431, 89 L. Ed. 2d 674] (1986); ellipsis and brackets in original). See also Montana v. Egelhoff, 518 U.S. 37, 42[, 116 S. Ct. 2013, 135 L. Ed. 2d 361] (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

*A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged.* See, *e.g.*, 41 C.J.S., Homicide § 216, pp. 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am. Jur. 2d, Homicide § 286, pp. 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (footnotes omitted)).

Holmes, 547 U.S. at 326-27 (emphasis added).

The Supreme Court held that the South Carolina rule was unconstitutionally arbitrary because it assumed that the prosecution's evidence should be credited rather than focusing on whether the proffered evidence, if credited, might tend to support a reasonable doubt as to the defendant's guilt without being repetitive, harassing, or confusing. Thus, the Court ruled, the application at trial of the South Carolina rule violated Holmes' "right to have "'a meaningful opportunity to present a complete defense.'"" Holmes, 547 U.S. at

331 (quoting Crane, 476 U.S. at 690) (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)).

Our Supreme Court recently explained that, since Downs and in light of Holmes, Washington has developed a more "restrained interpretation" of its "other suspect" evidence test. State v. Franklin, 180 Wn.2d 371, 381, 325 P.3d 159 (2014). At issue therein was whether Washington's "other suspect" case law barred Franklin from presenting circumstantial evidence pointing to another suspect who had the requisite motive, ability, opportunity, and character to have been the perpetrator. Franklin, 180 Wn.2d at 379-81. The trial court had interpreted Downs and subsequent cases as requiring—in order to admit the proffered evidence—specific facts showing that the other suspect *actually committed the crime*. Franklin, 180 Wn.2d at 379-81. The trial court excluded the evidence. Franklin, 180 Wn.2d at 379.

Our Supreme Court reversed the trial court's decision, explaining that it had "never adopted a per se rule against admitting circumstantial evidence of another person's motive, ability, or opportunity. Instead, our cases hold that if there is an adequate nexus between the alleged other suspect and the crime, such evidence should be admitted." Franklin, 180 Wn.2d at 373.

As in Holmes, our Supreme Court explained that "other suspect" case law simply evidences specific applications of well established evidentiary principles. Referencing its "other suspect" jurisprudence as a limitation on collateral evidence, the Franklin court continued:

In effect, this limitation on collateral evidence was similar to the requirement that evidence must have sufficient "probative value" to be relevant and admissible under ER 403. Evidence establishing nothing more than suspicion that another person might have committed the crime was inadmissible because its probative value was greatly outweighed by its burden on the judicial system. Other suspect evidence that establishes only such suspicion is inadmissible.

In contrast, we held in State v. Maupin that eyewitness testimony that a kidnapping victim was seen after the kidnapping with a person other than the defendant was both relevant and sufficiently probative to pass the Downs test. 128 Wn.2d 918, 928, 913 P.2d 808 (1996). Such evidence links the other suspect to the specific crime charged, either as the true perpetrator or as an accomplice or associate of the defendant. Evidence of this sort differs from evidence of motive, ability, opportunity, or character in that the proffered evidence *alone* is sufficient under the circumstances to establish the necessary connection. However, neither Maupin nor the earlier cases stand for the proposition that motive, ability, opportunity, and/or character evidence together can never establish such a connection. The Downs test in essence has not changed: some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime.

The trial court was thus incorrect to suggest that direct evidence rather than circumstantial evidence is required under our cases. The standard for relevance of other suspect evidence is whether there is evidence "'tending to connect'" someone other than the defendant with the crime. Downs, 168 Wash. at 667 (quoting 16 C.J. *Criminal Law* § 1085, at 560 (1918)), *quoted in* Maupin, 128 Wn.2d at 925. Further, other jurisdictions have pointed out that this inquiry, properly conducted, "focuse[s] upon whether the evidence offered tends to create a reasonable doubt as to the *defendant's* guilt, not whether it establishes the guilt of the *third party* beyond a reasonable doubt." Smithart v. State, 988 P.2d 583, 588 & n.21 (Alaska 1999).

180 Wn.2d at 380-81.

Thus, the threshold analysis for "other suspect" evidence involves a straightforward, but focused, relevance inquiry, reviewing the evidence's materiality and probative value for "whether the evidence has a logical

- 10 -

connection to the crime." Franklin, 180 Wn.2d at 381-82 (citing Holmes, 547 U.S. at 330).

B

Trial court decisions on the admission of evidence are reviewed for abuse of discretion. State v. Perez-Valdez, 172 Wn.2d 808, 814, 265 P.3d 853 (2011). "Such abuse occurs when, considering the purposes of the trial court's discretion, it is exercised on untenable grounds or for untenable reasons." State v. Clark, 78 Wn. App. 471, 477, 898 P.2d 854 (1995).

The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant a meaningful opportunity to present a defense.[2] State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). This right, however, is not absolute. It may, "in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," Chambers v. Mississippi, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), including the exclusion of evidence considered irrelevant or otherwise inadmissible. State v. Strizheus, 163 Wn. App. 820, 830, 262 P.3d 100 (2011); accord Jones, 168 Wn.2d at 720 ("Defendants have a right to present only relevant evidence, with no constitutional right to present *irrelevant* evidence."); State v. Aguirre, 168 Wn.2d 350, 363, 229 P.3d 669 (2010) ("[T]he scope of that right does not extend to the introduction of otherwise inadmissible

---

[2] "'The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment.'" Crane, 476 U.S. at 690 (quoting Strickland v. Washington, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

evidence.").

As with all evidence, the proponent bears the burden of establishing the admissibility of "other suspect" evidence. State v. Starbuck, 189 Wn. App. 740, 752, 355 P.3d 1167 (2015), review denied, 185 Wn.2d 1008 (2016). Because the premise underlying the introduction of "other suspect" evidence is to show that someone other than the defendant committed the charged crime, the standard for admission is whether the proffered evidence tends to indicate a reasonable doubt as to the defendant's guilt. Franklin, 180 Wn.2d at 381.

Evidence is relevant when it is both material—the fact to be proved "'is of consequence in the context of the other facts and the applicable substantive law'"—and probative—the evidence has a "tendency to prove or disprove a fact." State v. Sargent, 40 Wn. App. 340, 348 n.3, 698 P.2d 598 (1985) (quoting 5 K. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 82, at 168 (2d ed.1982)).

C

Ortuno-Perez asserts that, by excluding his proffered "other suspect" evidence pointing to Agnish as the actual killer, the trial court abused its discretion in its pretrial evidentiary rulings because its rulings were based on an incorrect application of Washington's "other suspect" case authority. Ortuno-Perez further contends that the "other suspect" evidence he proffered tended to support a reasonable doubt as to his guilt. We agree.

1

Prior to trial, Ortuno-Perez's counsel sought permission to present

evidence to the jury that Agnish, not Ortuno-Perez, killed Castro.[3] In his briefing, Ortuno-Perez's counsel indicated that it planned to present evidence that Agnish (1) was using prescription drugs at the time that Castro was shot, potentially altering his perception of the shooting and his memory thereof, (2) was armed with a handgun and in close proximity to Castro at the time of the shooting, (3) lied about having access to guns other than the one he admitted carrying at the time of the shooting, and (4) was a member of a gang and had expressed a belief that Castro belonged to a rival gang.

The trial court denied Ortuno-Perez's request based on its review of Washington's "other suspect" case law.

> These cases talk about the need for a nexus, connection, and the need to have admissible evidence to establish a foundation to conclude that someone else was the shooter and not the defendant in this case. In this case, based on all of the facts that I'm aware of that have been presented to the Court, as well as the information in the briefing, it's not sufficient that others were merely present. What is required and what the case law talks about are steps taken.[4]

Immediately thereafter, Ortuno-Perez's counsel engaged in a colloquy with the trial court to clarify the scope of its ruling. Defense counsel inquired into whether the ruling prevented him from eliciting testimony on cross-examination regarding each witnesses' motive to lie, including asking Agnish why he lied under oath regarding his possession of more guns than the amount he told the

---

[3] Although Ortuno-Perez's request focused on evidence pointing to Agnish as the true killer, Ortuno-Perez sought permission to introduce evidence that two other eyewitnesses—Parks and Perdoza—were also standing within a few feet of Castro when he was shot and thus had the opportunity to have been the shooter.

[4] The trial court, in explaining which cases it had reviewed, did not indicate that it had reviewed Holmes, 547 U.S. 319, or Franklin, 180 Wn.2d 371.

police he possessed. The trial court indicated that eliciting such testimony on cross-examination was indeed precluded by its "other suspect" ruling and that evidence tending to prove that Agnish possessed multiple firearms would also be excluded because, according to the trial court, it was not relevant.

Four days after the trial court's "other suspect" evidence ruling, and still prior to trial, defense counsel filed a sworn offer of proof regarding the evidence that it would have presented pointing to Agnish as the actual killer:[5]

## OFFER OF PROOF

But for the court's pre-trial ruling excluding "other suspect" evidence, the defense would have sought to introduce the following evidence:

-Austin Agnish was within several feet of Mr. Castro when Mr. Castro was shot.

-Mr. Agnish was armed with a handgun at the time Mr. Castro was shot.

-Police asked Mr. Agnish to bring in his weapon so that police could check if it had recently been fired.

-Mr. Agnish brought in a .40 caliber handgun for police to examine. Police determined that the gun had not recently been fired.

-During a defense deposition, Mr. Agnish told defense counsel that this was the only handgun he had ever owned or possessed.

-Mr. Agnish made several postings on his Facebook account showing different handguns than the .40 caliber gun that he brought

---

[5] Ortuno-Perez's counsel attested that:

Based upon the court's pre-trial rulings, the defense has been precluded from asserting an "other suspect" defense. The following is evidence that the defense would have sought to admit at trial based upon an "other suspect" defense. The defense is not making a strategic decision to not introduce this evidence, but rather is not introducing this evidence solely based upon the court's pre-trial rulings excluding this evidence.

- 14 -

in to [the] police.

-In one of these postings, which was posted prior to Mr. Castro's shooting, Mr. Agnish was attempting to sell a handgun and claimed in the posting that the gun was his, and that he had legally purchased it.

-In the same posting, Mr. Agnish referred to two other guns that he had named "Selena" and "Klarissa".

-Mr. Agnish was previously initiated into a gang and Mr. Agnish admitted that his gang was affiliated with the color blue.

-In 2011, Mr. Agnish posted a picture on his Facebook account of blue gang graffiti that he had written on a desk.  He expressed resentment that someone had crossed out his blue gang graffiti and replaced it with red gang graffiti.

-Mr. Agnish prominently displayed the color blue in pictures posted to his Facebook account, including multiple handgun pictures positioned across blue backgrounds.

-Mr. Agnish stated at his deposition that the Norteno gang was associated with the color red.

-In September 2013, roughly one month before Mr. Castro's shooting, Mr. Agnish posted on his Facebook account that he had acted out against Norteno gang members by throwing 5 dozen eggs at Norteno gang members.  Mr. Agnish wrote "get those Nortenos outta here cuh."

-Mr. Agnish stated in this same posting, "had to punk em without causing too much trouble in broad daylight."

-Mr. Agnish admitted under oath that on the night of Mr. Castro's shooting, something made him believe that Mr. Castro was a Norteno gang member.

-Dechas Blue stated during a defense interview that Mr. Agnish told him, "I feel like I might not live for two more years, you know, because, you know, now I got these Norteno's looking for me, they're looking for you, they're looking for Zach and Joey."  The defense would have argued that Mr. Agnish's fear of Nortenos only makes sense if Mr. Agnish was involved in the shooting of Mr. Castro.

-Ms. Erika Lazcano's first description of the shooter that she gave to police after the shooting was that the shooter was "wearing a black hoody, looked like cotton jeans, possible Mexican, around 20 years of age, 5'7", 5'8" and skinny[.]" Mr. Parks described Mr. Agnish to police as a "21 to 22 year old Hispanic" and "5'7", 170, . . . black sweatshirt/hoody and jeans."

-Ms. Lazcano told police that the person who shot Mr. Castro stated "Oh, where are you from?" Evidence would show that Mr. Castro and Mr. Ortuno-Perez knew each other, but that Mr. Castro and Mr. Agnish did not.

-No forensic evidence was produced tying Mr. Ortuno-Perez to this crime, nor excluding Mr. Agnish from being the shooter.

-Joey Pedroza [sic] downplayed the extent of his relationship with Mr. Agnish. When asked about this incident, Mr. Pedroza [sic] stated a guy named "Brian" was involved and never used Mr. Agnish's name. Facebook postings show a closer relationship between Mr. Agnish and Mr. Pedroza [sic] than Mr. Pedroza [sic] has admitted. The defense would have cross-examined Mr. Agnish and Mr. Pedroza [sic] on this issue to argue that Mr. Pedroza [sic] had bias and motive to lie to police, specifically to cover for his friend Mr. Agnish.

-The defense would have cross-examined Mr. Agnish about the foregoing issues in an effort to show bias and motive on the part of Mr. Agnish.

At a hearing on the same day that the offer of proof[6] was filed, Ortuno-

---

[6] When the motion before the trial court is one to exclude evidence, an offer of proof by the proponent is required by rule.

> Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and
>
> . . .
>
> (2) *Offer of Proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

ER 103(a).

> Such an offer serves three purposes.
> [I]t informs the court of the legal theory under which the offered evidence is admissible; it informs the judge of the specific nature of the offered evidence so that the court can assess its admissibility; and it creates a record adequate for review.

Perez's counsel again sought clarification from the trial court regarding the scope of its "other suspect" ruling. Specifically, Ortuno-Perez's counsel asked whether he could present evidence alluding to the notion that Lazcano's description of the shooter matched that of another person at the scene (without identifying that person by name) or, even, whether he was permitted to introduce evidence generally suggesting that anyone else at the scene of the crime, other than Ortuno-Perez, could have murdered Castro. Defense counsel emphasized that, without being able to present evidence that implicitly or explicitly supported the notion that someone else at the scene could have shot Castro, his defense of Ortuno-Perez would amount to stating, "Well, the State didn't prove their case."

The trial court again adhered to its ruling, stating that Washington's "other suspect" case law

> precludes defense counsel from pointing the finger to other people. Specifically, it does not preclude counsel from arguing general denial, does not preclude counsel from saying you can't find beyond a reasonable doubt that there is any evidence that would implicate your client, and it doesn't preclude counsel from pointing out some of the inconsistencies in identification, or any of the other

State v. Ray, 116 Wn.2d 531, 538, 806 P.2d 1220 (1991). An offer of proof is unnecessary only when "the substance of the excluded evidence is apparent from the record." Ray, 116 Wn.2d at 539.

When we review a trial court decision to exclude evidence, we evaluate the court's analysis of the proof offered in light of general evidentiary admissibility principles. Thus, we ordinarily assume that the trial court is making its admissibility evaluation in response to only the ground stated, ER 103(a), that matters discussed by counsel are within the contemplation of the judge, State v. Johnson, 48 Wn. App. 531, 537, 740 P.2d 337 (1987), that the judge "considered all pertinent arguments made by counsel," Johnson, 48 Wn. App. at 538, and that the judge ruled in relation to the circumstances of the case as it then existed. Johnson, 48 Wn. App. at 537.

During appellate oral argument, the State asserted that some of the evidence contained in Ortuno-Perez's written offer of proof was inadmissible for reasons other than the "other suspect" analysis. We are not in a position to determine if this is true or not true. Nothing in the trial record indicates that such an argument was advanced to the trial judge. More importantly, it is clear that the excluded evidence was excluded solely based on the State's "other suspect" objection to its admissibility.

information that counsel has identified in one form or another the witnesses may testify as to. So again, it is -- other suspect, really, is about pointing the finger to a specific other person or persons. And that's what the Court has indicated you may not do in this case.

[Defense Counsel]: So even saying – I will drop it after this – saying anyone else at that scene could have committed this crime, is that pointing the finger at somebody?

[The Court]: Basically yes.

2

The trial court, in its pretrial rulings, twice incorrectly applied Washington's "other suspect" case law. First, the trial court excluded evidence pointing to Agnish as the actual killer because the proffered evidence did not demonstrate "steps taken" by Agnish to commit the crime. However, our case law has never held that "other suspect" evidence must be excluded when a defendant cannot prove that the identified perpetrator had taken steps to commit the crime. Rather, as discussed above, the threshold analysis for "other suspect" evidence involves a straightforward, but focused, relevance inquiry, reviewing the evidence's materiality and probative value for "whether the evidence has a logical connection to the crime." Franklin, 180 Wn.2d at 381-82 (citing Holmes, 547 U.S. at 330).

In addition, in response to a request for clarification by Ortuno-Perez's counsel on the scope of the trial court's "other suspect" rulings, the court indicated that its rulings precluded Ortuno-Perez from "pointing the finger at somebody"—in particular, from arguing or postulating that anyone else at the scene of the crime could have committed the crime. This ruling, too, was

erroneous. Where, as here, the evidence is clear that a crime occurred (the fact that Castro was shot to death was undisputed), a defense of general denial is, of logical necessity, a defense that "someone else did it." This is not the same as an "other suspect" defense—which seeks to put the blame on a particular "other suspect." Here, it was clear that Castro was dead and that he was killed by someone at the scene. By refusing to allow Ortuno-Perez to argue from the evidence that he had been misidentified as the killer (logically meaning that someone else at the scene was the killer), the trial court converted the general denial defense to an argument that either Castro was not murdered (an illogical argument) or that the State did not prove that Ortuno-Perez was the shooter (illogical absent the context that someone else present may have instead been the shooter). The trial court's "other suspect" rulings were untenable.

3

The evidence proffered by Ortuno-Perez relating to Agnish's potential culpability was of a type that tended to logically connect Agnish to Castro's murder. If credited by the jury, it would establish Agnish's motive (a gang clash), his opportunity (he was present at the murder scene and in close proximity to Castro at the instant of the shooting), and his means (he was armed with a handgun). Thus, the evidence proffered was plainly relevant to the question of the identity of Castro's murderer and was of a type that, if credited by the jury, would support a reasonable doubt as to Ortuno-Perez's guilt.

Accordingly, the trial court abused its discretion by improperly excluding the proffered evidence.

III

The damage to Ortuno-Perez's defense was not limited to merely the inability to ask the jury to acquit based on evidence that Agnish may have been the killer—"other suspect" evidence raising a reasonable doubt. As the trial played out, Ortuno-Perez was also unfairly prejudiced in two major respects: his ability to confront the witnesses against him was compromised by the rulings preventing him from exploring the potential biases of witnesses who may have been covering for Agnish out of either affinity or fear; and his ability to argue in closing argument that logical inferences from the evidence actually admitted during trial supported a reasonable doubt as to his guilt was compromised by rulings precluding him from suggesting to the jury that anyone other than Ortuno-Perez himself had shot Castro.

A

At trial, the State argued that Ortuno-Perez killed Castro. The State's presentation of its case made clear that one of the several individuals standing near Castro fired the fatal shot. To that effect, the State offered a medical expert's testimony that, at the time of the gunshot, the barrel of the murder weapon was between two inches and two feet from Castro's head.

The State called several witnesses who had been at or near the site of the shooting to testify against Ortuno-Perez, including Blue,[7] Agnish, Perdoza,

---

[7] The State called Blue to testify on the first day of trial. Blue testified that he was an acquaintance of both Agnish and Parks but, because he was inside the house at the time, he did not see the shooting. However, Blue testified that, upon exiting the house, he saw Ortuno-Perez standing over Castro's body "looking . . . crazy."

Parks, and Lazcano.

Agnish began his testimony by discussing his relationship with Blue, Perdoza, Parks, and Ortuno-Perez. Agnish testified that he considered Blue "a brother," that he was "really good friends" with Perdoza, that he had not known Parks before he met him on the night of the shooting, and that he was a friend of Ortuno-Perez.

Agnish next testified that, prior to his arrival at the house where the shooting occurred, he was spending time with Perdoza, Blue, Parks, and Ortuno-Perez. Agnish stated that, later that night, he drove himself, Perdoza, and Blue in his car to the fateful house and that Ortuno-Perez had driven himself and Parks there. Agnish testified that when he arrived, he stayed outside of the house with several other people, including Ortuno-Perez and Perdoza.

Agnish testified that, while standing outside, he saw a car containing Castro,[8] Lazcano,[9] and their daughter pull up to the house. Agnish testified that when Castro got out of the car, he saw Castro and Ortuno-Perez shake hands and hug. Agnish estimated that he was "[p]robably four or five feet" from where Ortuno-Perez and Castro were standing. Agnish further testified that he heard

---

On cross-examination, defense counsel inquired into Blue's relationship with Agnish, who Blue referred to as "Sav", and established that Blue had never met Perdoza or Ortuno-Perez before the night of the shooting. Defense counsel further elicited testimony from Blue indicating that he did not see Ortuno-Perez with a gun in his hand when he saw him after the shooting and that, in comparing the statements that he made to the police on the night of the shooting with his trial testimony, Blue had been inconsistent in describing what transpired after the shooting.

[8] Throughout his testimony, Agnish referred to Castro by the name "Tank."

[9] During his testimony, Agnish referred to Lazcano as "the broad" or "the bitch carrying the baby."

Castro greet Ortuno-Perez by asking, "What's up, Playboy[10]?" Agnish averred that Ortuno-Perez did not respond to Castro's greeting. Agnish then testified to observing a series of escalating confrontations between Ortuno-Perez and Castro. According to Agnish, he then saw "the two arguing; I'm backing up. I just hear a bang; the dude's on the ground." Agnish claimed that he did not "know who shot, witnessed it, you know, et cetera." Agnish testified that, at that time, there were three or four people outside and he was standing four or five feet from Castro.

Agnish further testified that, in the immediate aftermath of the shooting, "The broads coming out. They screamed, and were screaming at me, 'Don't shoot.'" Agnish also indicated that he was afraid to testify because he had received death threats both for talking to the police about the murder and for being a potential witness at Ortuno-Perez's trial.

On cross-examination, Ortuno-Perez's counsel highlighted inconsistencies between Agnish's initial statements to the police and his trial testimony regarding his recollection of the events on the night of the shooting, including his conduct prior to arriving at the house where Castro was shot and the exact words Ortuno-Perez and Castro exchanged in the claimed confrontation between them. Defense counsel further inquired into how it was that Agnish was a good friend of Ortuno-Perez when, according to his testimony in a prior deposition, he had only met Ortuno-Perez once before. Ortuno-Perez's attorney also attempted to discredit Agnish's recollection of the events surrounding the shooting by pointing

---

[10] Throughout his testimony, Agnish referred to Ortuno-Perez as "Playboy" or Santiago.

out that Agnish had stated that he was high on oxycodone at the time, a drug which has a side effect of memory loss. Defense counsel also elicited more specific testimony from Agnish regarding the women who were screaming at him immediately after the shooting. Specifically, Agnish admitted that, immediately after Castro was shot, Castro's girlfriend, Lazcano, screamed at him, "Please don't shoot, don't shoot."

Perdoza was the State's next witness. Perdoza also began his testimony by discussing his relationship with Blue, Agnish, Parks, and Ortuno-Perez. He testified that he was not familiar with Blue, Parks, or Ortuno-Perez, but that he had been a friend of Agnish for three years.

Perdoza testified that, at the time of the incident, he and Agnish were standing outside of the house. Perdoza testified to seeing an argument between two men who were speaking Spanish. Perdoza then stated that, as he turned away, he "heard a loud pop noise," which startled him and caused him to run to Agnish's car. Perdoza testified that, thereafter, he quickly looked back to where the shooting happened and saw one person who was "[j]ust standing there." Perdoza also indicated that he was reluctant to testify because he had been receiving death threats for being a potential witness at Ortuno-Perez's trial.

On cross-examination, Ortuno-Perez's counsel pointed out inconsistencies between Perdoza's statements to the police and his trial testimony, including how much and what types of alcohol he had consumed. Defense counsel further inquired into contradictory statements made by Perdoza regarding the length of time that he had known Agnish.

The State then called Erika Lazcano. Lazcano testified that, at the time of the incident, she was getting her daughter out of the car (from the rear passenger side). She heard someone conversing with Castro in English. Lazcano testified that the person she saw talking to Castro was wearing a black beanie and a hoody.

Lazcano testified that she then "heard the gunshot." Lazcano stated that, at the time of the shot, she was holding her daughter in her arms and was walking toward Castro. From this vantage point, Lazcano was able to see that "Jesus went to the ground, he hit the floor, he got shot." Lazcano then approached Castro as he was laying on the driveway. Lazcano recalled that, as she did this, "everybody ran and got in their car." At this point, Lazcano stated, she "was scared at the same time because I didn't know if he was going to shoot me and my daughter because I didn't move my car." At the end of her direct examination, Lazcano identified Ortuno-Perez as the man she saw shoot Castro.

On cross-examination, Ortuno-Perez's counsel highlighted disparities between Lazcano's testimony and statements she made in a 911 call and to the police shortly after the shooting. These variances included where she had parked her car on the night of the shooting, her description of the shooter, and her actions immediately after the shooting. Defense counsel also pressed Lazcano on her trial testimony in which she indicated—for the first time at trial—

that the information that she gave to the 911 operator and to the police after the shooting was inaccurate.[11]

The State next called Zachary Parks. Parks testified that he did not recognize Perdoza by name, that he was a friend of Blue's, and that he recognized Agnish's and Ortuno-Perez's names. Parks next testified that, at the time of the incident, he was standing on the porch of the house smoking a cigarette. From this vantage point, he saw a man get out of a car and converse with Ortuno-Perez. Parks recalled that he was about 8 to 10 feet from where the man and Ortuno-Perez were standing. Parks testified that the man's greeting to Ortuno-Perez "was just, like, what's up, you know, 'What's up, Playboy,' you know, that's about it." Parks testified that he did not understand the remainder of the conversation because it was in Spanish, but that he observed an escalating confrontation between Ortuno-Perez and the man. Parks then testified that he was smoking a cigarette and not directly looking at the two men when he heard a boom and looked over. Parks testified that, when he looked over, he saw Ortuno-Perez with a gun in his hand, "[a]t the point of him pulling it back from the dude's head."

On cross-examination, Ortuno-Perez's counsel confronted Parks with contradictions between his initial statements to the police and his trial testimony. These contradictions related to the description of the guns that he claimed

---

[11] Did Lazcano really shout at Agnish not to shoot her because she had not moved her car? Or did she shout at Agnish not to shoot her because she had just seen Agnish (who matched the first description she gave to the police of the shooter) shoot Castro? Because of the trial court's rulings, defense counsel was barred from asking these questions, pressing these points, or arguing these inferences to the jury.

Ortuno-Perez showed him prior to arriving at the house where the shooting occurred and whether he moved Castro's body after he was shot.

The State called its last witness on the 10th day of testimony. Immediately thereafter, Ortuno-Perez moved for a mistrial based on the trial court's "other suspect" rulings and the resulting testimony that was elicited at trial. Ortuno-Perez argued that he was deprived of his right to present a defense and his right to confront witnesses because the trial court excluded evidence pointing to Agnish as the actual killer and the trial court precluded Ortuno-Perez from effectively cross-examining any of the witnesses about whether they had a motive to lie about who shot Castro.

The trial court denied Ortuno-Perez's motion. The defense rested without calling witnesses.

B

The trial court's rulings unfairly inhibited Ortuno-Perez's ability to confront the witnesses against him. This manifested itself in several different ways.

First, the trial court prohibited Ortuno-Perez from confronting Lazcano with—and informing the jury of—the fact that her first description of the shooter was a match for Agnish. Instead, cross-examination (and argument) on this point was limited solely to noting that Lazcano's initial description did not match Ortuno-Perez.

As noted previously, immediately after Castro was shot, Lazcano went up to his body. She then looked at Agnish and shouted, "Don't shoot me." But defense counsel was not allowed to question her as to why she shouted this at a

- 26 -

person who matched her initial description of her boyfriend's killer. (Nor, during closing argument, was defense counsel allowed to argue the logical inference that she shouted this because she had just seen Agnish murder Castro.) Instead, when Lazcano told the jury that she shouted this because she was afraid that Agnish was mad at her for not yet moving her car, defense counsel was required to merely accept the answer and move on.

In addition, Agnish, Perdoza, and Parks testified that they had been threatened as a result of their cooperation with the prosecution. The jury was left with the inference that Ortuno-Perez was the source of the threats. Due to the prior rulings, defense counsel was unable to explore whether the threats were the result of gang connections—or emanated from gang members—not promoted by Ortuno-Perez.

Finally, the primary State's witnesses were all acquainted. If Agnish was, indeed, the killer, they all had a reason to cover for him. And, if he was the killer, Lazcano had a reason to fear him. But due to prior rulings, defense counsel was unable to pursue these avenues of inquiry on cross-examination.

In these ways, the pretrial rulings excluding the proffered "other suspect" evidence were made even more damaging to Ortuno-Perez as the trial played out.

### C

The Sixth Amendment right to counsel encompasses the delivery of closing argument. Herring v. New York, 422 U.S. 853, 858, 95 S. Ct. 2250, 45 L. Ed. 2d 593 (1975). Our Supreme Court "has recognized the particular

importance of closing argument to the effective exercise of this right." State v. Frost, 160 Wn.2d 765, 773, 161 P.3d 361 (2007) (citing State v. Perez-Cervantes, 141 Wn.2d 468, 474, 6 P.3d 1160 (2000)). "Where a trial court goes too far in limiting the scope of closing argument, a defendant's constitutional rights may be implicated." Frost, 160 Wn.2d at 772.

> The court cannot compel counsel to reason logically or draw only those inferences from the given facts which the court believes to be logical. The rule is well stated in Sears v. Seattle Consol. St. Ry., 6 Wash. 227, 233, 33 P. 389 (1893):
>
>> It is the duty of the court, in all cases, to restrict the argument of counsel to the facts in evidence, and not to permit the opposite party to be prejudiced by any statement of facts not a part of the evidence. But counsel must be allowed some latitude in the discussion of their causes before the jury, and if they are not permitted to draw inferences or conclusions from the particular facts in evidence it would be impossible for them to make an argument at all. The mere recital of facts already before the jury is not an argument. There must be some reason offered for the purpose of convincing the mind, some inference drawn from facts established or claimed to exist, in order to constitute an argument.
>
> See also, 1 J. Wigmore, Evidence § 30 (3d ed. 1940).

City of Seattle v. Arensmeyer, 6 Wn. App. 116, 121, 491 P.2d 1305 (1971).

Closing argument "is the defendant's 'last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt.'" Perez-Cervantes, 141 Wn.2d at 474 (quoting Herring, 422 U.S. at 862).

> The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than

the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

Herring, 422 U.S. at 862.

Allowing attorneys to argue inferences from the evidence is a rudimentary aspect of this right. State v. Ciskie, 110 Wn.2d 263, 283, 751 P.2d 1165 (1988). "[C]ounsel must be afforded 'the utmost freedom in the argument of the case' and 'some latitude in the discussion of their causes before the jury.'" Perez-Cervantes, 141 Wn.2d at 474 (quoting Sears, 6 Wash. at 232-33).

A ruling on "other suspect" evidence is a ruling that determines whether evidence may be admitted at trial. Here, however, the trial court extended the reach of its "other suspect" rulings, instructing defense counsel that it could not, in closing argument, say anything that "pointed to" anyone other than Ortuno-Perez as the killer. By so ruling, the trial court prohibited defense counsel from arguing the effect of inferences that could reasonably be drawn from the evidence that was actually admitted at trial. This ruling further unfairly prejudiced Ortuno-Perez's right to present a defense.

For instance, Lazcano's initial description of the killer was testified to in front of the jury. The jury also personally observed Agnish in court. But while Ortuno-Perez was allowed to argue to the jury that the initial description did not describe him, he was not allowed to argue to the jury that the initial description *did* describe Agnish.

Similarly, while the jury heard testimony regarding Lazcano shouting at Agnish not to shoot her, Ortuno-Perez was forbidden to argue the connection

between this exclamation and her first description of the killer—a man resembling Agnish.

The trial court's restrictions on the defendant's closing argument went well beyond its pretrial evidentiary "other suspect" rulings. In practice, it prevented the defense from presenting any logical closing argument to the jury: in the face of clear evidence that 1) Castro was shot to death and 2) the shot was fired at close range, Ortuno-Perez was prevented from arguing that one of the other people standing in close proximity to Castro must have fired the shot. This left him with two pathetic choices—arguing vacuously that the prosecution "hadn't proved its case" against him or arguing that Castro was not shot at all. With the latter a complete impossibility, he was left with merely the former. This was a denial defense, to be sure, but not the strongest, most logical denial defense afforded by the evidence adduced at trial, coupled with reasonable inferences therefrom.

In this way, too, Ortuno-Perez was denied his right to present a complete defense.

IV

The trial court's erroneous rulings were not harmless. An error of constitutional magnitude is harmless only if the State can prove beyond a reasonable doubt that the jury would have reached the same result in the absence of the error. Chapman v. California, 386 U.S. 18, 21-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (an error of constitutional magnitude cannot be deemed

harmless unless it is "harmless beyond a reasonable doubt"); accord Maupin, 128 Wn.2d at 928-29.

We are not so persuaded. The trial court errors discussed above may well have altered the jury's view of the evidence.

V

Because of the manner in which we resolve this appeal, we need not address any of the other errors claimed by defense counsel to have occurred or raised by Ortuno-Perez in his statement of additional grounds. Our restraint in this regard should be viewed as neither an affirmance nor a rejection of the trial court rulings at issue. The parties are free to fully litigate them should they arise on remand.

Similarly, our resolution of the "other suspect" issue with regard to Agnish does not foreclose, on remand, the possibility that other, or additional, evidence may be unearthed pointing to yet another possible perpetrator. If so, that issue may be fully and fairly litigated on remand.

VI

The proffered "other suspect" evidence was such that it could have caused a reasonable juror to doubt whether Ortuno-Perez was guilty as charged. Thus, the trial court erred by excluding it. This error was compounded by the trial court's subsequent restrictions on cross-examination and closing argument. A new trial is required.

Reversed and remanded.

Douglas, J.

We concur:

Mueller, CJ

Spearman, J.