IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 78544-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTIAN J. ARCHAGA-REYES, | ) | |
| | ) | |
| Appellant. | ) | FILED: January 6, 2020 |
| | ) | |

ANDRUS, J. — Christian Archaga-Reyes appeals his domestic violence convictions for second degree rape and for felony and misdemeanor violations of a no-contact order. At trial, he contended his victim, M.M., an undocumented immigrant, fabricated the charges against him to gain protected status so she could stay in the United States with her children. He argues the trial court denied him a fair trial by limiting the questions he could ask M.M. about her children's citizenship status and by refusing to recognize a defense witness as an "expert" in front of the jury. He also contends the prosecutor committed reversible error by referring to current immigration policies during the State's closing argument. Finally, Archaga-Reyes argues the trial court failed to give a Petrich[1] unanimity instruction on the rape charge and his felony convictions violate double jeopardy.

---

[1] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984), abrogated on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988).

We conclude the trial court did not err in deciding the appropriate scope of cross-examination or in refusing to affirmatively inform the jury that a defense witness was an "expert." We also conclude that while the prosecutor's closing comments about Trump administration anti-immigration policies were inappropriate, they were neither flagrant nor ill-intentioned and did not prejudice Archaga-Reyes. Furthermore, because the State made a clear and explicit election to rely solely on the first of four successive rapes, all occurring during the same night, the court was not required to give a Petrich instruction. Finally, the felony violation of a no-contact order and rape convictions do not violate double jeopardy. We therefore affirm Archaga-Reyes' convictions.

## FACTS

Archaga-Reyes, a Honduran immigrant, met M.M., a Mexican immigrant and mother of two children, at a birthday party in 2015. Shortly thereafter, Archaga-Reyes and M.M. began dating and ultimately had a consensual sexual relationship. In the fall of 2015, M.M. broke off the relationship with Archaga-Reyes, who did not want the relationship to end.

In January 2016, Archaga-Reyes assaulted M.M., leading him to plead guilty to two counts of domestic violence assault in the third degree and one count of domestic violence assault in the fourth degree. As a result of these convictions, the court entered a five-year no-contact order for M.M.'s protection.

Less than eight months later, on August 7, 2016, Archaga-Reyes appeared at M.M.'s first-floor apartment in Tukwila. M.M., who was alone at the time, let him into the apartment because he asked for help and told her that he loved her. Once

inside, he asked for food; when she did not prepare any for him, he started insulting her. M.M. told Archaga-Reyes to leave. He then hit her and called her a "bitch," a "prostitute," "garbage," and "an old lady." When M.M. told Archaga-Reyes she intended to call the police, he took away her phone, pushed her, threw her down to the floor, and pulled out some of her hair. He told her he intended to hit her but that he would not hit her in the face because he did not want there to be visible evidence of the abuse. She tried to fight back, but he was stronger than she was. Archaga-Reyes blocked the front door for about one hour to keep M.M. from leaving.

When M.M. realized he would not let her leave the apartment, she was so exhausted from fighting that she retreated to her bedroom. Archaga-Reyes then blocked her bedroom door. When M.M. tried to escape the bedroom, they wrestled again; Archaga-Reyes forced her onto the bed and raped her four times within a matter of three hours.

M.M. did not sleep that night. Once Archaga-Reyes fell asleep, M.M. went to her kitchen to find a knife with which to kill her rapist. But the thought of her children made her put the knife down. She found her phone but she did not call the police. She assumed they would not believe she had been assaulted and raped because she had let Archaga-Reyes into her apartment despite the existence of the no-contact order. She left the apartment at 5:00 a.m. to go to work.

When she returned that afternoon, August 8, she saw him standing outside her apartment. M.M. stayed inside her car with the windows closed.

- 3 -

Archaga-Reyes demanded money from her so he could travel to Canada. She refused his demand, grabbed her phone, and told him she was calling the police. Archaga-Reyes left at that point. M.M. ran into her apartment and locked herself in. Shortly thereafter, she fled to a girlfriend's house to spend the night.

The following night, August 9, 2016, M.M. was at home when Archaga-Reyes knocked on her window. M.M. fled to the bathroom and locked herself inside. Archaga-Reyes called and sent her text messages, apologizing, asking her to forgive him, and telling her that he had repented. Again, when she did not answer his calls and messages, he called her a whore and told her all of his problems were her fault. After an hour and a half, he left.

The following day, August 10, 2016, M.M. met with her therapist, David Jeraiseh, to tell him about the incidents. Jeraiseh described M.M. as "in an emotional crisis" when she arrived. He could see spots on M.M.'s scalp where her hair was missing. M.M. told him that Archaga-Reyes had pulled her hair out and had sexually assaulted her. With Jeraiseh's encouragement and that of his supervisor, she agreed to go to the police station with Jeraiseh to report the crimes committed against her. She testified she made this decision after Jeraiseh's supervisor talked to her about how "some insects get on animals, and they just go to town on them until there's nothing left, and that would be the situation if I didn't report it."

At trial, there was disputed testimony as to what M.M. told the police during the interview on August 10. Initially, M.M. only wanted to report that Archaga-Reyes had violated the no-contact order; she did not want to tell the police she had

been raped. But M.M. testified she told the police Archaga-Reyes raped her. Jeraiseh testified she did not tell the police about the rape and told the police only that she had been physically assaulted. Officer Schlotterbeck similarly testified that M.M. did not tell him she had been raped. M.M. thought the miscommunication occurred because of her poor English, and she thought telling the police she had been assaulted meant she had reported being raped.

The State originally charged Archaga-Reyes in December 2016 with one count of felony domestic violence violation of a court order for the assault on August 7, 2016, and two counts of misdemeanor violations of a court order for the alleged contact Archaga-Reyes had with M.M. in the days thereafter.[2] The State amended the information in February 2018 to add the charge of rape in the second degree, domestic violence, after M.M. ultimately reported the sexual assault.

Before trial began, the trial court and counsel discussed the relevance of Archaga-Reyes' and M.M.'s immigration status. Defense counsel indicated these topics would come up, stating, "I don't believe it's going to be – It's certainly not the crux of my case, but – and I'm not bringing in an expert to get into the particulars. But it is going to come up, I suspect, during [M.M.'s] testimony." Defense counsel acknowledged the topic's sensitivity, stating he did not intend to "turn this into the centerpiece of my trial." But counsel explained that during a

---

[2] The State alleged the second contact occurred on August 8 and the third contact occurred on August 10. During trial, the State amended the information a third time to reflect M.M.'s testimony that the third contact she had with Archaga-Reyes occurred on August 9, rather than August 10.

defense interview, M.M. admitted she was aware of the U Visa;[3] she was aware of its availability for people "like her;" she had recently spoken to her counselor, Crystal, about it; and she and Crystal were working on an immigration application because of this case. The trial court accepted this offer of proof and allowed the parties to inquire into this topic.

In his opening, Archaga-Reyes stated that the State's case rested entirely on the testimony of M.M., an undocumented immigrant from Mexico, who had two children, both born in the United States and U.S. citizens. He contended that M.M. failed to tell the police she had been raped until sometime before an interview with defense counsel, and by that time, M.M. was taking steps to change her immigration status with the assistance of her counselor.

After testifying at trial about the details of the assault and rape by Archaga-Reyes, M.M. confirmed that her two children—ages 17 and 12—were both born in the United States after she moved here from Mexico. When defense counsel asked M.M. if she was undocumented, the State objected to the question. The trial court overruled the objection but, for some reason, defense counsel abandoned that line of questioning and, thus, there is no evidence in the record as to M.M.'s actual immigration status.

M.M. testified that her counselor, Crystal, who had assisted her with a divorce, told M.M. that there were visas for people "that may be in a similar

---

[3] A U visa grants temporary legal resident status to a person who is the victim of a qualifying crime and who helps law enforcement investigate or prosecute that crime. State v. Romero-Ochoa, 193 Wn.2d 341, 344, 440 P.3d 994 (2019); see also 8 U.S.C. § 1101(a)(15)(U).

situation" as she was in. But M.M. denied knowing what a U Visa is or applying for any type of protected status based on the court case.

In the defense case, Archaga-Reyes called Lynne Berthiaume, a registered nurse experienced in caring for victims of sexual assault. Berthiaume described the standard procedure for conducting a sexual assault examination, including the interview process and the gathering and preserving of physical evidence for law enforcement. She testified that in the case of an alleged forcible rape, an exam would look for evidence of injuries—such as contusions, bruising, abrasions, redness, or fractures—and secretions, in particular evidence of ejaculation. According to Berthiaume, in this case, "there was no corroborating evidence of penetration or sexual assault." She admitted she could not say affirmatively whether M.M. was sexually assaulted or raped.

The jury convicted Archaga-Reyes as charged. The court denied his motion for a new trial, and sentenced him to 60 months for the felony violation of a no-contact order conviction and an indeterminate sentence of 210 months to life for the second degree rape charge, including community custody. He was sentenced to 364 days for each of the misdemeanor violations of a no-contact order. All sentences run concurrently.

Archaga-Reyes appeals.

## ANALYSIS

### A. Cross-Examination of Victim

Archaga-Reyes first argues the trial court denied him the constitutional right to present a defense by limiting his questions to M.M. about her children's

citizenship status. He contends this line of questioning was critical to exploring M.M.'s motive for fabricating rape allegations against him. We conclude the trial record does not support Archaga-Reyes' contention that the trial court prevented him from questioning M.M. about her children's citizenship status.

The United States Constitution and the Washington State Constitution guarantee defendants the right to present a defense. U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, § 22; State v. Wittenbarger, 124 Wn.2d 467, 474, 880 P.2d 517 (1994). A criminal defendant's right to present a defense includes the right to confront and cross-examine adverse witnesses. State v. Romero-Ochoa, 193 Wn.2d 341, 347, 440 P.3d 994 (2019); State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). But the right to confront adverse witnesses is not absolute; trial courts "retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." State v. Lee, 188 Wn.2d 473, 487, 396 P.3d 316 (2017) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). Accordingly, a defendant has no right to present irrelevant or inadmissible evidence. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); see also State v. Mee Hui Kim, 134 Wn. App. 27, 41, 139 P.3d 354 (2006).

Our Supreme Court recently affirmed that Washington courts conduct a two-step inquiry when a defendant claims the trial court's evidentiary rulings deprived him or her of the Sixth Amendment right to present a defense. State v.

Arndt, __ Wn.2d __, 453 P.3d 696, 703 (2019) (applying the two-step standard of review articulated in State v. Clark, 187 Wn.2d 641, 648-56, 389 P.3d 462 (2017)).

First, we review the trial court's evidentiary rulings for an abuse of discretion and uphold those rulings unless "no reasonable person would take the view adopted by the trial court." Clark, 187 Wn.2d at 648 (quoting State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001) (quoting State v. Ellis, 136 Wn.2d 498, 504, 963 P.2d 843 (1998))). If there is no abuse of discretion, we then review de novo whether those evidentiary rulings deprived the defendant of his or her Sixth Amendment right to present a defense. Arndt, 453 P.3d at 703.

Before trial, the court ruled Archaga-Reyes could elicit evidence from M.M. regarding her immigration status and that of her children because it was relevant to M.M.'s credibility. On cross-examination, defense counsel had M.M. confirm she had been born in Mexico, moved to the United States when in her 20s, was then 43 years old, and had lived here for around 20 years. He also had her confirm that her children were 17 and 12 years old. Defense counsel then asked M.M. if her children were born in the United States. The prosecutor objected, and before the court could rule, M.M. answered, "Of course." A sidebar ensued, after which the court overruled the State's objection.

The next day, the State asked to put this sidebar on the record. The State represented that the trial court had sustained its objection to the questions about the children's status or where they were born. Defense counsel corrected the record:

[DEFENSE COUNSEL]: . . . [M]y recollection from yesterday is that the State objected to me questioning about, asking questions about the kids' status in the U.S.

State objected. We had a sidebar where the Defense put on the record we believed it was relevant, because if the kids are U.S. citizens but the mom isn't, that goes to her motive, added motive to try to obtain citizenship. And my recollection was that the [c]ourt sustained – or overruled the objection. Isn't that what you said?

THE COURT: I know I told you to move on.

[PROSECUTOR]: Yeah. I believe Defense already asked that question, and I had kind of asked for a sidebar.

THE COURT: I essentially said to move on at that point.

[DEFENSE COUNSEL]: Okay.

THE COURT: So I didn't sustain and ask the jury to disregard. But that was as far as I was going to let you go.

Thus, the trial court overruled the State's objection to the question, and M.M.'s answer regarding her children's citizenship status stood; it was not stricken from the record, and the trial court did not instruct the jury to disregard it.

As for the court's request that defense counsel "move on" to a different line of questioning, there is no indication as to what, if any, questions defense counsel wanted to ask M.M. and was precluded from asking. In fact, defense counsel confirmed with M.M. that she had primary custody of her two children. Defense counsel asked M.M. if she was undocumented, a line of questioning defense counsel abandoned after the trial court overruled the State's objection. And the trial court also permitted Archaga-Reyes to ask M.M. whether her "counselor was sending information from this case to people who can look at it for the purpose of immigration." M.M. answered in the affirmative to this latter question.

In closing arguments, Archaga-Reyes advanced his theory that M.M. was motivated to fabricate allegations of a rape to obtain a protected immigration status and to ensure she could remain in the United States because her children were U.S. citizens and she was not. After pointing out the lack of physical evidence, the purportedly poor police investigation, and the inconsistencies in M.M.'s testimony, Archaga-Reyes argued:

> And let's just address this now, because it was a contested issue during the trial, but, obviously, it's relevant: [M.M.] is not documented. She has two children, both of whom were born in the U.S. We know through [Jeraiseh], her therapist, that she is working with Crystal, her counselor, on her immigration application.
>
> . . . .
>
> We know that Crystal is the person who was urging [M.M.] to file these charges, and that Crystal was helping her with her divorce, and that, based on what [M.M.] said, information from this specific case is being used in that immigration process. Two plus two equals four, folks. That is suspicious. It's suspicious that . . . she's going through this immigration application process and using stuff from this case.
>
> The State, in its closing argument, said, in this Trump era, you wouldn't want to testify if you're undocumented, or he tried to argue that, somehow, with this new administration, it helps his case, when in fact the opposite is true, in that if you are undocumented and you are scared right now, of course that would explain why you're willing to do things that you might not otherwise be willing to do, because it is a different time right now, and that might explain why she's waited 20 years to do it. You just can't ignore it.
>
> Jury Instruction Number 1 will tell you, in assessing a witness's credibility, as the judge said, you may consider the personal interest at stake, and what she stands to gain.
>
> And I would submit to you that if you have two children who are U.S. citizens and you are not a U.S. citizen, getting citizenship is a huge gain, and it's at the expense of [Archaga-Reyes].

While I can understand why she wants what she wants, I can't condone the manner in which she's trying to do it, and the reason why is because she's doing it at the expense of Christian Archaga-Reyes, a 24-year-old kid, who she doesn't care about.

From this record, it is clear that Archaga-Reyes was allowed to ask M.M. about the citizenship status of her children and effectively argued that their status as U.S. citizens and her status as undocumented motivated her to fabricate allegations against him.

Archaga-Reyes contends that his case is analogous to State v. Ortuno-Perez, 196 Wn. App. 771, 385 P.3d 218 (2016). We disagree. In that case, the defendant sought to introduce, and the trial court excluded, any evidence that another suspect committed the murder. Id. at 774-75. This court held the trial court erred in applying Washington's "other suspect" case law and the erroneous ruling denied the defendant the ability to confront the witnesses against him. Id. at 775, 790, 797. Specifically, the defendant was not allowed to confront an eye witness about the fact that her initial description of the shooter matched another individual or to challenge the witness's testimony regarding why she shouted "Don't shoot me" at the man she originally identified as the killer. Id. at 797. In addition to excluding any of this evidence, the trial court further restricted what defense counsel could say in closing argument:

> [T]he trial court extended the reach of its "other suspect" rulings, instructing defense counsel that it could not, in closing argument, say anything that "pointed to" anyone other than Ortuno-Perez as the killer. By so ruling, the trial court prohibited defense counsel from arguing the effect of inferences that could reasonably be drawn from the evidence that was actually admitted at trial.

Id. at 800.

First, in Ortuno-Perez, the trial court erred in applying the legal test for the admissibility of other suspect evidence. Id. at 790. There is no contention here that the trial court committed similar legal error. Archaga-Reyes contended evidence as to M.M.'s immigration status and her children's citizenship status was relevant to her motive to lie; the trial court agreed and permitted him to question M.M. about both.

Second, in Ortuno-Perez, the trial court barred all evidence from any witness regarding even the possibility that someone other than the defendant committed the crime. Id. at 791-92. There was no similar "complete bar" here. See also Arndt, 453 P.3d at 711 (distinguishing Jones and holding that, despite limitations placed on expert's testimony by the court's evidentiary rulings, defendant was able to present relevant evidence advancing her central defense theory). Archaga-Reyes was permitted to ask M.M. about her immigration status, about the location of her children's birth, her sole custody of her children, and her application for some type of protected immigration status as a result of this case. And he presented all of this information to the jury in closing arguments.

Lastly, we do not know what questions defense counsel was not "permitted" to ask because there was no offer of proof made at any stage of the trial. In Ortuno-Perez, the defense made a clear proffer of the "other suspect" evidence it sought to introduce. Id. at 785. ER 103(a)(2) provides that error may not be predicated on a ruling excluding evidence unless the substance of the evidence is made known to the court by offer or is apparent from the context within which questions were asked. It is not apparent from this record what evidence Archaga-Reyes

- 13 -

sought to introduce that he was not allowed to ask. The only argument he advances on appeal is that he was not permitted to confirm with M.M. that the children were U.S. citizens. Even if the record supported this contention, his defense was not affected in any way by such a limitation because it was obvious from M.M.'s testimony that the children were U.S. citizens while M.M. was not.

Our conclusion is consistent with the Supreme Court's analysis in State v. Arndt. There, due to the limited nature of the defense expert's investigation into the cause and origin of a fire, the trial court limited his testimony as to the cause and origin of that fire. 453 P.3d at 703. Arndt contended excluding this evidence denied her the right to a defense to the charges of arson and murder. Id. The Supreme Court disagreed. First, "because all of the trial judge's exclusion decisions were supported by tenable reasons and based on correct statements of the law," there was no abuse of discretion in limiting Arndt's expert's testimony. Id. at 705. And, second, "despite the limitations placed on [the expert's] testimony by the court's evidentiary rulings, Arndt was able to present relevant evidence supporting her central defense theory: that the fire marshal's investigation was fundamentally flawed and that the proposed origin and ignition sequence was incorrect." Id. at 711. Because the evidentiary ruling did not eliminate Arndt's entire defense, the Court concluded that "Arndt suffered no violation of her Sixth Amendment right to present a defense." Id. at 712.

We conclude, similar to Arndt, the trial court properly exercised its gatekeeping function and did not deny Archaga-Reyes the right to present a defense when it instructed defense counsel to "move on" after Archaga-Reyes had

- 14 -

established through cross-examination that M.M.'s children were born in the United States.

B. Trial Court Comment Relating to Defense Expert Witness

Next, Archaga-Reyes argues the trial court made an unconstitutional comment on the evidence when it informed counsel that it would not designate a defense witness as an expert in front of the jury. Article IV, section 16 of the Washington State Constitution prohibits a trial court from commenting on the evidence. State v. Swan, 114 Wn.2d 613, 657, 790 P.2d 610 (1990). "An impermissible comment is one which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed the testimony in question." Id.

During a pretrial hearing, Archaga-Reyes moved to admit the testimony of his expert witness, Lynne Berthiaume. The defense sought to call her to explain the typical method of collecting evidence from a rape victim—procedures the police did not follow in this case. The State objected to the relevance of her testimony. The trial court overruled the objection, granted the defense motion, and informed the parties:

> THE COURT: And I'm not going to announce a witness is an expert or anything. You can lay your foundation, but I won't say in court that that person is qualified as an expert.
>
> [DEFENSE COUNSEL]: Understood by Defense.

When Berthiaume took the stand, defense counsel laid the foundation as to her qualifications as a registered nurse with experience in examining victims of

sexual assault. After Berthiaume finished listing her qualifications, defense counsel moved to have her admitted as an expert witness, despite being instructed by the court not to do so:

> [DEFENSE COUNSEL]: Your Honor, at this time, Defense moves to have Ms. Berthiaume regarded as an expert in forensic nursing pursuant to.
>
> THE COURT: That's not something the [c]ourt says on the record, in front of the [jury].

Defense counsel asked for a sidebar, during which the trial court explained it was not its practice to call any witness an expert but confirmed Berthiaume would be allowed to testify as an expert. The court reiterated its stance from motions in limine:

> THE COURT: . . . And I did say, I believe, personally, that it's a comment on the evidence for me to make that determination and then tell the jury that I think she's an expert.
>
> [DEFENSE COUNSEL]: Okay.
>
> THE COURT: That's why I don't do it. . . .
>
> [DEFENSE COUNSEL]: And I apologize. But understood.

Berthiaume then testified without objection from the State.

Archaga-Reyes now contends the trial court made an impermissible comment on the evidence by telling defense counsel, in front of the jury, that it would not comment on the witness's status as an expert. He argues that under Swan, it is not impermissible for a court to admit a witness as an expert in front of the jury and, therefore, the trial court was wrong in believing that doing so would be a comment on the evidence.

In Swan, the defendants, accused of statutory rape, argued that the trial court impermissibly commented on the evidence when it ruled, on the record, that "the evidence establishes [the State witness's] qualifications in the general subject of sexual abuse of children. The court will accept her as an expert on that subject." 114 Wn.2d at 657 (emphasis omitted). The Supreme Court disagreed concluding that

> [a] court must be allowed to rule as to the qualifications of expert witnesses and inform counsel of its decision. The trial court did just that in its ruling regarding [the doctor] and did not offer a personal opinion about the doctor's testimony. There was no comment on the evidence in accepting the doctor as an expert witness.

Id. at 657-58. While Swan holds that a trial court is permitted to make an evidentiary ruling on the admissibility of an expert's testimony in front of the jury, the case does not require a trial court to affirmatively do so.

Furthermore, the State never challenged Berthiaume's credentials or her expertise in the subject matter on which she testified, and the trial court offered no opinion as to Berthiaume's credibility, or the sufficiency or weight of her testimony. The jury was instructed that it was to determine the credibility or weight to be given to any expert witness testimony. The court also instructed that it is prohibited from making a comment on the evidence and that it had not intentionally done so. If it appeared to the jury that it had indicated a personal opinion in any way during trial, the court instructed the jury to "disregard this entirely." Even if the court's statement could be construed as an error, the error was cured by these instructions. See State v. Elmore, 139 Wn.2d 250, 276, 985 P.2d 289 (1999) (any

- 17 -

comment on the evidence was cured by instruction to disregard same); Egede-Nissen v. Crystal Mountain, Inc., 93 Wn.2d 127, 141, 606 P.2d 1214 (1980) (isolated judicial comment may be cured by an instruction).

We conclude the trial court did not violate article IV, section 16.

C. Prosecutorial Error in Closing Argument

Archaga-Reyes next maintains that the prosecutor's statements in closing arguments, invoking President Trump's immigration policies and suggesting M.M. could obtain a visa without alleging she had been raped, warrant reversal of his convictions because they inflamed the passions and prejudices of the jury and referred to facts not in evidence.

In closing, the prosecutor argued:

> Defense may make hay of this visa application that may or may not be going on . . . . It's unclear. But when I asked [M.M.], point-blank, "Are you applying for a U visa?" She said, "No." "Have you ever signed anything?" She said, "No."
>
> There's no gain for her testifying here; she has everything to lose. She put herself in jeopardy to be up here and testifying. And you'll remember Defense asked her, point-blank, "Are you documented in this country?" I do not have the words to express how extremely uncomfortable that must have made her.
>
> It's 2018, Donald Trump's our president, and you're being asked in court to answer, point-blank, "Are you here legally or illegally?"
>
> And we've got a court reporter. She's writing down your answer that will be saved as a record of this case forever.
>
> And [M.M.] had a choice: Tell the truth, or she could lie and save her own skin. She made the most difficult decision of all, and that was to tell the truth. So, here's [M.M.], she has everything to lose by coming in here and telling you what happened to her in August of 2016, and nothing to gain.

Archaga-Reyes did not object to this argument, request a curative instruction, or move for a mistrial.

To prevail on a claim of prosecutorial error in closing argument, the defendant must establish that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). The burden to establish prejudice requires the defendant to prove that there is a substantial likelihood that the instances of misconduct affected the jury's verdict. Id. at 442-43. The failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. Id. at 443; see also State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

We generally afford the State great latitude in making arguments to the jury. State v. Sublett, 156 Wn. App. 160, 185, 231 P.3d 231 (2010), aff'd on other grounds, 176 Wn.2d 58, 292 P.3d 715 (2012). But a prosecuting attorney represents the people and presumptively acts with impartiality in the interest of justice. Thorgerson, 172 Wn.2d at 443. As a quasi-judicial officer, a prosecutor must subdue courtroom zeal for the sake of fairness to the defendant. Id. It is thus improper for a prosecutor to appeal to the jury's passion or prejudice. State v. Brett, 126 Wn.2d 136, 179, 892 P.2d 29 (1995). Arguments that may evoke an emotional response are appropriate if the prosecutor restricts the arguments to the circumstances of the crime. Id. at 214.

Archaga-Reyes argues that the prosecutor inflamed the passion and prejudice of the jury by talking about President Trump and his immigration policies. We agree that referring to the President of the United States and to the immigration policies of his administration—in a case involving a Honduran undocumented immigrant accused of rape—was inappropriate. M.M. was not asked about these policies or their impact, if any, on her decision to report the rape to the police or her decision to testify in court. Nor was there any evidence that she believed her testimony could put her in danger of deportation under the current administration's policies. The comments were allusions to matters outside the evidence and were improper.

But we cannot conclude that the comments were so flagrant or ill-intentioned that a curative instruction could not erase the prejudice. First, the absence of an objection by defense counsel or a motion for a mistrial at the time of the closing "strongly suggests to a court that the argument or event in question did not appear critically prejudicial" to the defendant in the context of the trial. Swan, 114 Wn.2d at 661.

Second, we need to put the prosecutor's comments in context. The prosecutor's reference to the current administration's immigration policies was made in response to the defense theory that M.M. was lying to shield herself from deportation. Had Archaga-Reyes objected, and the jury been instructed to disregard the argument, we believe such an instruction would have cured any prejudicial effect. See id. at 662-63 (inaccurate description of expert testimony made in closing and in response to defense's argument, "not so flagrant and

ill-intentioned" that it could not have been cured by a timely objection and a curative instruction).

Finally, Archaga-Reyes has not established a substantial likelihood that the statements affected the jury's verdict. In analyzing prejudice, we do not look at comments in isolation but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). Archaga-Reyes used the reference to President Trump in his closing argument, arguing that these very same immigration policies increased M.M.'s motivation to fabricate the allegations against him:

> The State, in its closing argument, said, in this Trump era, you wouldn't want to testify if you're undocumented, or he tried to argue that, somehow, with this new administration, it helps his case, when in fact the opposite is true, in that if you are undocumented and you are scared right now, of course that would explain why you're willing to do things that you might not otherwise be willing to do, because it is a different time right now, and that might explain why she's waited 20 years to do it. You just can't ignore it.

In the overall context of the testimony, evidence, and arguments presented, both sides used the President's immigration policies to advance their arguments. As a result, Archaga-Reyes cannot establish the requisite prejudice.

We thus conclude that while the prosecutor's statements about the Trump administration's immigration policies and their impact on M.M.'s decision to testify were improper, they did not prejudice Archaga-Reyes and, thus, did not amount to reversible error.

Archaga-Reyes also argues that the prosecutor made other improper statements to which he objected and that these comments also constituted reversible error. In rebuttal, the prosecutor argued that Archaga-Reyes' theory did not make sense because M.M. could obtain protected status without having to allege she had been raped:

[PROSECUTOR]: We asked her, point-blank, "Are you applying for this? Have you signed any documents?" And she said, "No." And [Jeraiseh] thinks maybe Crystal's helping her. It's unclear. But [M.M.] said she's not. Now, the thing about applying for this protected status, though, and what doesn't quite make sense in Defense's theory, it would have been enough for her to just say he violated the order.

[DEFENSE COUNSEL]: Objection; facts not in evidence.

THE COURT: Sustained.

[PROSECUTOR]: If she's going to call the police to get [Archaga-Reyes] in trouble, to fake being a victim of domestic violence, tell the police, "He showed up at my door, he showed up at my door and then he left before you guys got here," uh, that's still a criminal charge; it's still a case. It doesn't make sense that she would—she doesn't have to make up being raped to apply for this status.

[DEFENSE COUNSEL]: Again, Your Honor, facts not in evidence.

THE COURT: Sustained.

. . . .

[DEFENSE COUNSEL]: Your Honor, I would just ask that the jurors be asked to disregard.

THE COURT: The objection aside, I'll just remind the jury, first of all, that the attorneys' closing arguments are not evidence and they're not the law.

The evidence is what you heard from witnesses, stipulations and exhibits that were admitted, and the law is what I give to you.

- 22 -

So, during those two sustained objections, you are to disregard what was argued.

Archaga-Reyes argues these comments prejudiced him. But the trial court sustained his objections and gave several curative instructions, both during the closing and in its written instructions. Instruction No. 1 reiterated what the jury could consider in making its decision:

The evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses, stipulations and the exhibits that I have admitted during the trial.

. . . .

You are the sole judges of the credibility of each witness.

. . . .

The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

Absent evidence to the contrary, juries are presumed to follow the court's instructions. State v. Montgomery, 163 Wn.2d 577, 596, 183 P.3d 267 (2008); see also Swan, 114 Wn.2d at 661-62.

Archaga-Reyes relies on State v. Case, 49 Wn.2d 66, 298 P.2d 500 (1956), and State v. Pete, 152 Wn.2d 546, 98 P.3d 803 (2004), to contend that the cumulative effect of the prosecutor's comments about M.M.'s eligibility for protected status impermissibly boosted M.M.'s credibility and vilified Archaga-Reyes. But both cases are distinguishable.

In Case, the prosecutor went outside the record on multiple occasions to express his personal opinions about sexual deviation, members of the Jehovah's Witnesses faith, and the defendant, a father, whom the prosecutor believed had raped his own daughter. 49 Wn.2d at 68-70. The Washington Supreme Court concluded that the sheer number of times the prosecutor went outside the evidence in his closing and expressed his own opinions could not be cured with an instruction to disregard. Id. at 70. Here, the prosecutor made only two statements to which Archaga-Reyes immediately objected and which the trial court immediately instructed the jury to disregard.

And in Pete, police reports containing inculpatory statements by the defendant were inadvertently delivered to the jury during deliberations, despite the fact the evidence was not admitted at trial. 152 Wn.2d at 553. Because the contents of the documents undermined Pete's defense, the court determined that nothing short of a new trial could cure the error. Id. at 554-55. Here, we have no evidence that the jury considered extrinsic evidence in its deliberations.

We conclude the trial court's instructions to the jury to disregard these statements were sufficient to cure any misconduct.

D. Petrich Instruction

Archaga-Reyes argues the trial court failed to give a Petrich unanimity instruction, a manifest constitutional error he may raise for the first time on appeal. We review the adequacy of jury instructions de novo. State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007).

In Washington, a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed. State v. Stephens, 93 Wn.2d 186, 190, 607 P.2d 304 (1980). "When the prosecution presents evidence of several acts that could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act." State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988); see also State v. Petrich, 101 Wn.2d 566, 570, 683 P.2d 173 (1984). This Petrich instruction preserves the constitutional right to a unanimous jury verdict by telling the jury that the State must prove a particular criminal act beyond a reasonable doubt and that all jurors must unanimously agree on which act it proved. See State v. Carson, 184 Wn.2d 207, 217 & n.5, 357 P.3d 1064 (2015) (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.25, at 110-12 (3d ed. 2008)).

The jury instructions here did not include a Petrich instruction. But such an instruction is not necessary where the State elects the act on which it will rely for a conviction. Carson, 184 Wn.2d at 227. Before the trial court finalized the instructions, it asked the State whether it intended to "make an election" during closing arguments to comply with Petrich. The State answered in the affirmative. An effective election must clearly identify the act on which the charge in question is based, thereby disclaiming the State's intention to rely on other acts for conviction. Carson, 184 Wn.2d at 227-28, 228 n.15. Carson provides that where the State makes an effective election—"clearly and explicitly" telling the jury during

closing argument which acts the State is relying on for conviction—then no <u>Petrich</u> instruction is required. <u>Id.</u> at 228-29.

Archaga-Reyes was charged with felony violation of a no-contact order on August 7, 2016, when he willfully violated the terms of a court order by intentionally assaulting M.M. Archaga-Reyes contends he was convicted of felony violation of a no-contact order by a non-unanimous jury because the State failed to elect whether Archaga-Reyes' act of pushing M.M. and pulling her hair while fighting in her living room or the physical struggle and hitting that preceded the rape in M.M.'s bedroom gave rise to the assault element of the charge. The record does not support Archaga-Reyes' argument.

During closing argument, the prosecutor explained the elements of the felony violation of a no-contact order charge, focusing on whether Archaga-Reyes' conduct satisfied the definition of assault.

> So the Defendant's conduct was an assault. So what are we talking about when we talk about an assault? Now, you also have a definition for "assault," and it says that it's any harmful or offensive touching.
>
> So, when [Archaga-Reyes] goes into [M.M.'s] apartment and grabs her by the hair and throws her on the ground, that is both a harmful and an offensive touching. As [M.M.] said, that hurt; she didn't like that.
>
> So his conduct constituted an assault while he was inside. And when you assault somebody while you have a no[-]contact order in place, you are guilty of a crime. That is one of the ways you violate the no[-]contact order.

In this argument, the State made clear and explicit the conduct on which it relied for a jury determination of assault—grabbing M.M. by her hair and throwing her to

the ground. As in <u>Carson</u>, the State made a clear and explicit election to rely on Archaga-Reyes grabbing M.M. by her hair and throwing her to the ground as the basis for the felony violation of a no-contact order charge.

Archaga-Reyes raises the same argument regarding the rape charge. He was charged with engaging in sexual intercourse with M.M. by forcible compulsion between August 7 and 10, 2016. The State argued in closing:

> So what are we left with? It's the Rape in the Second Degree. . . .
>
> So the Defendant engaged in sexual intercourse with [M.M.], and that it was by forcible compulsion. Now, to be very clear, the testimony that was elicited, she did say that he raped her on four different occasions kind of right in a row.
>
> But what I'm talking about is the first time, right, what she told you happened in that bedroom and that after [Archaga-Reyes] had come into her house, started accusing her of all sorts of things, got upset with her, took her phone, grabbed her hair, he threw her on the ground, and they struggled. Remember, he told her he was not going to hit her where he was going to leave any marks. That was not going to happen. He pulled her hair.
>
> At some point, she's able to kind of make her way to the bedroom. She runs in there because he's standing at the doorway, not letting her leave the apartment. But he follows her, and he's standing in the bedroom doorway, and they start to struggle again. And during that struggle, he's able to remove her pants and her underwear, and he throws her on the bed. She's still fighting, she's trying, but she's getting tired. He's been there a while, and they've been fighting almost the entire time, he's wearing her down. He pins her arms to her, unbuckles his belt, and he takes his pants off.
> Now, remember what she said: He spread my legs apart, and then he put his penis in my vagina. That's rape. She said, no, she didn't want to, she tried to fight him, but he did it anyway. Not only did he do it, he told her he was going to do it, and he laughed.
>
> That's what makes him guilty of Rape in the Second Degree, Forcible Compulsion. You'll be able to read the definition. This was sexual intercourse by forcible compulsion.

- 27 -

Although the prosecutor referenced the assault while talking about the rape, the State's election was sufficiently clear and explicit—it relied on the incident described by M.M. during which Archaga-Reyes forcibly pinned her to her bed, unbuckled his belt, removed his pants, and raped her while she tried to fight him off. It affirmatively told the jury it was not relying on the subsequent rapes which M.M. did not describe in this detail. On this record, no Petrich instruction was required.

E. Double Jeopardy

Finally, Archaga-Reyes argues the court violated double jeopardy when it convicted him of both a violation of the no-contact order predicated on assault and rape in the second decree predicated on forcible compulsion. We review claims of double jeopardy de novo. State v. Muhammad, No. 96090-9, slip op. at 7, __ Wn.2d __, 451 P.3d 1060, 2019 WL 5798575, at *20 (Wash. Nov. 7, 2019) (Gordon McCloud, J.), http://www.courts.wa.gov/opinions/pdf/960909.pdf (quoting State v. Kier, 164 Wn.2d 798, 804, 194 P.3d 212 (2008)).

The double jeopardy clauses of the Fifth Amendment and Washington Constitution article I, section 9 protect a defendant against multiple punishments for the same offense. Id., slip op. at 6-7, 2019 WL 5798575, at *20. Double jeopardy prohibits multiple convictions for one crime, absent evidence that the legislature intended multiple convictions. State v. Novikoff, 1 Wn. App. 2d 166, 169, 404 P.3d 513 (2017). Whether multiple punishments are permitted for the same criminal conduct is a question of legislative intent. Muhammad, No. 96090-

9, slip op. at 7, 2019 WL 5798575, at *20 (Gordon McCloud, J.); see also Kier, 164 Wn.2d at 803-04. Courts apply the Blockburger[4] test to determine whether the legislature authorized multiple punishments. Novikoff, 1 Wn. App. 2d at 169. The test determines whether two crimes are the same offense by evaluating whether the crimes have the same elements and require the same evidence, id., essentially asking "'whether each provision requires proof of a fact which the other does not,'" State v. Gocken, 127 Wn.2d 95, 101, 896 P.2d 1267 (1995) (quoting Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). "'If there is clear legislative intent to impose multiple punishments for the same act or conduct, this is the end of the inquiry and no double jeopardy violation exists.'" Arndt, slip op. at 34, 2019 WL 6605529, at *15 (quoting State v. Kelley, 168 Wn.2d 72, 77, 226 P.3d 773 (2010)).

Archaga-Reyes was convicted under the assault prong of the no-contact order statute, RCW 26.50.110(4), which provides that "[a]ny assault that is a violation of an order issued under . . . chapter 10.99, . . . and that does not amount to assault in the first or second degree . . . is a class C felony . . . ." As applicable here, an assault is "an intentional touching or striking of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person." See State v. Madarash, 116 Wn. App. 500, 513-14, 66 P.3d 682 (2003). In addition, the State had to prove the existence of a no-contact order and Archaga-Reyes' knowing violation of the order.

---

[4] Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

Archaga-Reyes was also convicted of rape in the second degree, domestic violence, under RCW 9A.44.050(1)(a), which provides that "[a] person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person . . . [b]y forcible compulsion." Forcible compulsion is defined as "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself . . . , or in fear that she . . . will be kidnapped." RCW 9A.44.010(6).

We conclude the two convictions are not for the same criminal conduct. The State did not need to prove forcible compulsion or sexual intercourse to establish that Archaga-Reyes assaulted M.M. And the State did not need to prove the existence of a no-contact order, willful violation of that order, or intentional touching or striking with unlawful force, to prove Archaga-Reyes raped M.M. Rape criminalizes nonconsensual sexual intercourse regardless of criminal intent or knowledge. State v. Walden, 67 Wn. App. 891, 895, 841 P.2d 81 (1992). But the crime of assault requires proof of intent. Id. at 894. As a result, fourth degree assault is not a lesser included offense to second degree rape. Id. The elements of these two felonies are clearly not the same, and the evidence to prove the violation of a no-contact order by assault would be different from the evidence needed to prove the rape.

Archaga-Reyes relies on State v. Martin, 149 Wn. App. 689, 691, 205 P.3d 931 (2009), a case in which the defendant was convicted of second degree assault and attempted rape in the third degree. In that case, this court reversed Martin's

conviction of attempted rape under double jeopardy. Id. It concluded that the crime of second degree assault and attempted third degree rape were the same in fact and law because the two charges were predicated on the same conduct: Martin's assault of the victim with the intent to rape her. Id. at 700. As a result, the same evidence used to convict Martin of assault was used to convict him of attempted rape. Id.

Martin is distinguishable because Archaga-Reyes' charges were not predicated on the same conduct. The assault charge was based on Archaga-Reyes grabbing M.M. by the hair and throwing her to her living room floor. The rape charged was based on nonconsensual sexual intercourse in M.M.'s bedroom.

Archaga-Reyes next contends that the two crimes offend double jeopardy under the merger doctrine. The merger doctrine has been recognized as a tool for determining legislative intent, even when two crimes have formally different elements. State v. Freeman, 153 Wn.2d 765, 772, 108 P.3d 753 (2005). Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime. Id. at 772-73. But the degree of Archaga-Reyes' rape was not elevated by proof of an assault or a no-contact order violation. And the State did not need to establish a no-contact order violation to prove rape. The merger doctrine does not apply.

We conclude the convictions for felony violation of a no-contact order predicated on an assault and for rape in the second degree do not violate double jeopardy.[5]

We affirm Archaga-Reyes' convictions.

WE CONCUR:

_Andrus, J._

_Schindler, J._

_Appelwick, C.J._

---

[5] We also reject Archaga-Reyes' cumulative error argument. While cumulative error may warrant reversal even if each error standing alone would otherwise be considered harmless, the doctrine does not apply where the errors had no effect on the outcome of the trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Archaga-Reyes has not demonstrated an accumulation of errors or that any affected the outcome here.