IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>v.<br><br>EMANUEL KOZMA,<br><br>     Appellant. | No. 86833-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Emanuel Kozma was convicted of assault in the first degree while armed with a firearm and unlawful possession of a firearm in the second degree. He challenges his convictions on several grounds. First, he argues that he was denied his right to present a defense and his right to confront witnesses when he was prevented from asking a witness about his knowledge of the victim's allegedly abusive relationship. He further contends that the trial court violated these rights when it prevented him from recalling this witness to impeach the victim's testimony. He then argues that he received ineffective assistance when his counsel failed to argue that the witness's testimony was admissible and that it was necessary to recall the witness to present evidence of another suspect. He also raises additional issues in a statement of additional grounds for review (SAG). We conclude the trial court did not err and that Kozma does not satisfy his burden to show ineffective assistance of counsel. Therefore, we affirm.

BACKGROUND

Emanuel Kozma and Amanda James met sometime between 2016 and 2017, when Kozma dated James's sister. Kozma and James continued to be in contact, as Kozma was a friend of James's brother. Sometime in August 2022, Kozma drove James to the house of his friend, Thomas Hobart, so she could see his dog, which she knew from its previous owner. James had not previously met Hobart, but the two got along. After Kozma left that evening, James remained at the house, and James testified that Kozma took her phone when he left, leaving her with only her "backup phone," which worked only when connected to a Wi-Fi network.

A few days after Hobart and James first met, on August 15, 2022, the two were painting Hobart's RV when Kozma came over with a scooter for Hobart to work on. James testified that while Kozma was in the garage, she confronted him and demanded to know where her phone was located. She said that as the two argued about the phone, Kozma took a gun out of his backpack and put it to James's forehead, telling her to shut up "or I'm going to shoot you." According to James, she then pushed the gun away from her, turned around, and began to walk away. She walked, at most, a foot or two before she was shot in the back of the neck. James testified that Hobart was in the garage for the whole argument, including when she was shot.

According to Hobart, when James and Kozma began arguing, he left the garage to get parts from a nearby shed. Hobart testified that he was at the shed for a "couple minutes" and could hear James and Kozma arguing. He then heard a gunshot or "bang, a little pop sound" that he thought was a firecracker, and the arguing stopped. He clarified that he did not hear anyone other than Kozma and James arguing in the

garage. Hobart walked back to the garage and, as he was approaching, it sounded like a truck "was stopped and it took off from a dead stop," although he never saw the vehicle. He also thought he heard someone say something like "Let's go," but he was not certain. Hobart testified that he did not see anyone other than James and Kozma at his home at that time.

Hobart said after hearing the shot, he returned to the garage within approximately 15 seconds. He saw James on the floor and Kozma nearby, and he asked Kozma to "get [James] up." Kozma "got [James] to wake up," and told Hobart to call an ambulance. Hobart retrieved his phone from his truck, which was about 10 feet away from the garage. Kozma left as Hobart called 911.

While on the phone with the 911 operator, James identified the shooter several times as "Emanuel," Kozma's first name. Hobart provided a physical description of Kozma because he was "the only person [Hobart] saw with [James] prior to the shooting." When King County Sheriff's Office Detectives Daniel McCreary and Jean Marquez Romero arrived on the scene, McCreary asked James who had shot her, and she told him "Emanuel."

James was taken by ambulance to Harborview Hospital, where doctors discovered her injuries included a bullet fragment in her cervical spine and a broken vertebra. In the days after the shooting, both Hobart and James were shown six-person photo montages and identified Kozma as the perpetrator. James remained in the ICU for months following the shooting. By the time of trial in 2024, James had recovered some movement in her arms, but she still had no movement in her hands or legs.

3

The State charged Kozma with three counts: (1) assault in the first degree with a firearm enhancement, (2) assault in the second degree with a firearm enhancement and the aggravator of injuries substantially exceeding the level of bodily harm necessary to satisfy the elements of assault in the second degree, and (3) unlawful possession of a firearm in the second degree. The parties agreed to bifurcate the proceedings for the unlawful possession of a firearm charge.

The jury convicted Kozma as charged on the two assault charges. It then heard evidence on the unlawful possession charge and found Kozma guilty on that count, as well. At sentencing, the trial court granted an agreed order vacating count two for assault in the second degree because it merged with count one for assault in the first degree. The trial court sentenced Kozma to a standard-range sentence of 279 months, as well as a 60-month firearm enhancement, for a total of 339 months. Kozma filed a timely notice of appeal.

DISCUSSION

Kozma contends that the trial court erred and denied him his right to present a defense and his right to confront witnesses when it prevented him from asking Hobart about his knowledge of an allegedly abusive relationship James was in at the time of the shooting. He also argues that the court erred by denying his request to recall Hobart as a witness to impeach James's testimony that she was not in an abusive relationship. Additionally, he contends that he received ineffective assistance when his counsel failed to argue that Hobart's testimony and recall were admissible because they were "other suspect" evidence. Finally, he asserts that cumulative error denied him a fair trial.

4

I. <u>Right To Present a Defense</u>

Kozma's claims relating to his right to present a defense and right to confront witnesses are based on his attempts to elicit testimony from Hobart about James's allegedly abusive relationship. The court limited this line of questioning, concluding first, that it was hearsay and later, that to the extent Hobart's testimony would impeach James, it would be about a collateral matter.

Before trial, the State filed a motion in limine to "preclude other suspect evidence." In response, Kozma clarified that his defense was general denial, and he had not provided notice of an "other suspect" defense and "that's not [his] intent here." However, he wanted to ensure that this ruling did not preclude him from "arguing to the jury that they should have doubt about who committed this . . . there's no physical evidence tying [Kozma] to this. So[,] it kind of implies, without naming an actual other suspect." The trial court reserved ruling on the issue, "subject to further argument and potential evidence."

At trial, during Hobart's cross-examination, Kozma asked a series of questions related to James's alleged boyfriend, including about his understanding of James's relationship status:

> Q.     Is it your understanding that [Kozma] dropped off [James] a couple days before the shooting happened because he wanted . . . to help her get away from an abusive relationship?
>
> A.     That's what I understood, yeah.

The State objected based on hearsay. Outside the presence of the jury, the court asked how Hobart's response was admissible as an exception to hearsay, as his knowledge of the abusive relationship was from either "Kozma . . . and/or  [James]." Kozma specified

5

that he was not "asking . . . specifically what was said, just what his understanding was of the circumstances." Kozma also stated he was unsure how Hobart was aware of the abuse, but that in the defense interview, Hobart said that James told him she was in an abusive relationship and that Hobart had observed James had injuries when she initially arrived. Because Hobart apparently knew about the abuse only "by virtue of hearsay," the court sustained the State's objection and instructed the jury to "disregard the last statement."

Shortly thereafter, Kozma began questioning Hobart again about James's alleged boyfriend:

[Kozma] Q.   And you don't know who [James's] boyfriend was back in August of 2022?

[Hobart] A.   No. I do not.

Q.   You don't know what car he drove?

A.   No.

Q.   You don't know if he knew that [James] was spending the night at your house for several days?

A.   I don't know.

Q.   You don't know if he knew how to find her at your house?

A.   I don't know.

Q.   And you don't know if he was the person who was speeding away in the loud truck immediately –

The State again objected and requested to be heard outside the presence of the jury. It contended that Kozma was attempting to elicit "other suspect" evidence and that this line of questioning was an impermissible attempt to establish that the person who shot James was James's boyfriend at the time because James was staying at  Hobart's

6

place. Kozma responded that he was not arguing "other suspect" evidence because he was not "pointing to a particular person" but was "asking questions based on inferences that [Hobart] would be able to make." The court noted that the line of questioning was "clearly aimed at blaming the boyfriend," sustained the objection, and struck the last question.

Subsequently, Kozma asked James on cross-examination about her relationship status:

[Kozma] Q.  Now, you were not dating or in a relationship with [Hobart]?

[James] A.  No.

Q.  Okay. But at the time of the shooting, you were dating someone; is that correct?

A.  I was not dating nobody [sic].

Q.  Not dating anybody. And so you didn't tell [Hobart] that you were dating someone?

A.  No.

Q.  You didn't tell [Hobart] that that person was abusive towards you?

The State objected, and, outside the presence of the jury, reiterated its concern that this questioning was intended to elicit "other suspect" evidence. In response, Kozma again argued that his intent was to recall Hobart to impeach James's credibility, because in Hobart's defense interview, he said James told him she was in an abusive relationship and "was relieved to be at his house," and that Hobart saw bruises on her. The State argued the evidence was not otherwise admissible and it concerned impeachment on a collateral matter. The court sustained the objection.

The trial court also denied Kozma's request to recall Hobart to impeach James. It reaffirmed its ruling prohibiting Kozma from eliciting information concerning an abusive relationship between James and her alleged partner. It also reiterated that the line of questioning did "begin to . . . intrude [on] [its] ruling with respect to the State's motion in limine regarding other suspects." Finally, when considering whether the issue was a collateral matter, it asked, "Could the fact upon [which the] error is based have been brought into evidence for a purpose independent of the contradiction?" Because it had denied Kozma's request to ask about the abusive relationship because it was hearsay, the court determined that the fact could not have been brought into evidence independent of the contradiction.

"The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant a meaningful opportunity to present a defense." State v. Giles, 196 Wn. App. 745, 756, 385, P.3d 204 (2016). However, this right is not absolute, and it "may. . .'bow to accommodate other legitimate interests in the criminal trial process,' including the exclusion of evidence considered irrelevant or otherwise inadmissible." Id. at 756-57 (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)).

The court undertakes a two-part analysis when a criminal defendant asserts that an evidentiary ruling has violated their constitutional right "to present a defense." State v. Ritchie, 24 Wn. App. 2d 618, 627, 520 P.3d 1105 (2022). "First, we review the trial court's ruling for an abuse of discretion, applying the evidentiary rule or evidentiary statute at issue." Id. "Such abuse occurs when, considering the purposes of the trial court's discretion, it is exercised on untenable grounds or for untenable reasons." State

8

v. Clark, 78 Wn. App. 471, 477, 898 P.2d 854 (1995). "Second, we consider de novo whether there has been a violation of the defendant's Sixth Amendment rights." Ritchie, 24 Wn. App. 2d at 627.

    A.  Review of Evidentiary Rulings

Kozma first challenges the court's ruling that he could not ask Hobart about James's relationship status because his knowledge was based on hearsay. We review de novo whether a statement was hearsay. State v. Gonzalez-Gonzalez, 193 Wn. App. 683, 689, 370 P.3d 989 (2016) (because "ER 802 explicitly states that hearsay evidence is not admissible except as provided by the hearsay exception rules," we do not review for abuse of discretion). "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). "Whether a statement is hearsay depends upon the purpose for which the statement is offered." State v. Crowder, 103 Wn. App. 20, 26, 11 P.3d 828 (2000). "A statement is not hearsay if it is used only to show the effect on the listener." State v. Edwards, 131 Wn. App. 611, 614, 128 P.3d 631 (2006). "However, where an out-of-court statement is offered for the truth of what someone told the witness, the statement is hearsay even though the witness only implies the out-of-court statement." Gonzalez-Gonzalez, 193 Wn. App. at 690 (citing State v. Hudlow, 182 Wn. App. 266, 276-77, 331 P.3d 90 (2014)) ("Inadmissible evidence is not made admissible by allowing the substance of a testifying witness's evidence to incorporate out of court statements by a declarant who does not testify.")

For example, in Hudlow, the State sought to introduce testimony from a detective who overheard a telephone call between a confidential informant and the defendant.

9

182 Wn. App. at 271. The detective heard only the informant's portion of the conversation. Id. at 277. On review, Division Three of this court concluded the testimony was inadmissible hearsay because it was offered to prove the truth of the matter asserted—that the informant and Hudlow agreed to meet at a location for Hudlow to sell the informant methamphetamine. Id. at 280-81. The court reasoned the detective's testimony was hearsay despite the State's attempt to rephrase questions to avoid direct quotes from the informant, as the detective still "only echoed what he may have heard the informant utter." Id. at 281.

Here, Kozma intended to elicit testimony from Hobart that James arrived at his house to get away from an abusive relationship, so that Kozma could later argue that this alleged abusive partner may have shot James instead. Even though Kozma claims he was not specifically asking Hobart what he was told about the relationship, the question still called for hearsay, as the proffered testimony was derived from others' out-of-court statements offered for the truth of what they told Hobart—i.e., that James was in an abusive relationship. Thus, the trial court did not err when it prevented Kozma from questioning Hobart about James's allegedly abusive relationship.

Second, Kozma challenges the court's refusal to let Kozma recall Hobart to impeach James's testimony as to her relationship status and the nature of her relationship. The court ruled that it would be impeachment on a collateral matter. "It is a [well-recognized] and firmly established rule . . . that a witness cannot be impeached upon matters collateral to the principal issues being tried." State v. Oswalt, 62 Wn.2d 118, 120, 381 P.2d 617 (1963). "An issue is collateral if it is not admissible independently of the impeachment purpose." State v. Fankhouser, 133 Wn. App. 689,

10

693, 138 P.3d 140 (2006). The test for determining whether a fact is a collateral matter asks, "Could the fact upon which error is based have been brought into evidence for a purpose independent of the contradiction?" State v. Dickenson, 48 Wn. App. 457, 468, 740 P.2d 312 (1987). "Put another way, a witness may be impeached on only those facts directly admissible as relevant to the trial issue[s]." Fankhouser, 133 Wn. App. at 693. Facts are relevant if they have a tendency to make the existence of any consequential fact more or less probable. ER 401.

To convict Kozma of assault in the first degree, the State needed to prove that "on or about August 15, 2022 [Kozma] assaulted [James] . . . with a firearm or by a force or means likely to produce great bodily harm or death . . . that [Kozma] acted with intent to inflict great bodily harm[,] and [t]hat this act occurred in the State of Washington." Thus, whether James was in an abusive relationship at the time she was shot was neither a principal issue being tried, nor was it a fact directly admissible as relevant to the trial issues, independent of the contradiction. Further, Kozma agreed it was not his intent to admit "other suspect" evidence, and, as discussed below, the evidence was not relevant as "other suspect" evidence. Accordingly, Hobart's testimony on recall about James's relationship status would have addressed a collateral matter, so the trial court did not err by denying Kozma's request to recall Hobart to so testify.

B. Exclusion of Evidence as Violation of Constitutional Right

The second step in the analysis of a claim of violation of the right to present a defense requires this court to examine "whether the trial court's ruling, despite being a proper application of the evidentiary rules, nonetheless runs afoul of either the state or federal constitutions." Ritchie, 24 Wn. App. 2d at 629. Indeed, the second step of the

analysis is not "merely a repetition of the analysis undertaken at step one." Id. Rather, "we articulate what has remained the underlying concern of the courts in deciding 'right to a defense' cases: whether there is a unique or aberrant rule that results in the defendant having a lesser Sixth Amendment right than that possessed by citizens in other jurisdictions." Id. "[T]he pertinent concern is whether both parties receive a fair trial." Id. at 634. "Accordingly, when the defendant has an opportunity to present [their] theory of the case, the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights." Id. at 635.

Here, we conclude Kozma was not denied his right to present a defense, as he was able to present his theory of the case and was afforded the opportunity to effectively cross-examine James.

First, "[t]he hearsay rule has 'long been recognized and respected by virtually every [s]tate' and 'is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact.' " State v. Lizarraga, 191 Wn. App. 530, 558, 364 P.3d 810 (2015) (quoting Chambers, 410 U.S. at 298). Thus, exclusion of evidence based on this rule does not demonstrate an unconstitutional limitation on Kozma's right to present a defense.

Kozma's theory of the case was that someone else shot James, given the gaps in evidence and seemingly incomplete investigation. Even without Hobart's testimony about James's relationship, Kozma was able to elicit testimony supporting his theory, including that there was a loud vehicle that left the area at the time of the shooting and that Hobart thought he heard someone yell "Let's go" after the shooting. Further, Hobart testified that he was not present when the gun was fired, the gun was not recovered,

12

and there was no forensic evidence linking Kozma to the crime. Kozma also cross-examined the police witnesses about their investigation, highlighting perceived shortcomings such as not seeking forensic testing on various pieces of evidence, not searching Hobart's house, and not seeking cell phone location data for any of the involved parties. Because Kozma was still able to argue that evidence did not link him to the scene and that someone else could have shot James, the trial court's exclusion of Hobart's testimony concerning James's abusive relationship did not violate his constitutional rights.

Similarly, the trial court's ruling that Hobart could not be recalled to impeach James did not violate his right to confront witnesses. Kozma pursued multiple lines of questioning designed to discredit James's testimony as inconsistent, biased, and inaccurate. At the beginning of James's cross-examination, Kozma elicited her acknowledgment that she disliked him. He also highlighted that James had been using drugs just prior to the shooting, that during the 911 call she told Hobart to hide drug paraphernalia before the police arrived, and that she had two pipes in her pocket the day she was shot. When James was asked whether she had pipes on her the day of the shooting, she stated that she could not "recall but possibly." Kozma also questioned James about whether Hobart was in the garage at the time of the shooting and asked her if she could estimate where Hobart was located in the garage. She could not provide an answer. He also emphasized that James had her back turned when she was shot. In closing, Kozma argued that James's testimony was inconsistent and inaccurate, highlighting how her testimony directly conflicted with Hobart's, that she lied about asking Hobart to hide drug paraphernalia and having two pipes on her that day, that she

13

disliked Kozma, and that she had smoked methamphetamine earlier in the day. In sum, Kozma was still able to effectively impeach James, despite the exclusion of Hobart's testimony, that she was possibly in an abusive relationship. The trial court did not deprive Kozma of his right to present a defense by refusing to allow him to question Hobart about James's allegedly abusive relationship.

## II. Ineffective Assistance of Counsel

Kozma next argues he received ineffective assistance because his counsel did not argue that Hobart's testimony was admissible as evidence of another suspect. We disagree.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). For a successful claim of ineffective assistance of counsel, a defendant must establish both objectively deficient performance and resulting prejudice. State v. Emery, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). To show deficient performance, the defendant must show that counsel's representation fell below an objective standard of reasonableness in light of all the circumstances. Strickland v. Washington, 466 U.S. 668, 688 (1984). "Courts engage in a strong presumption counsel's representation was effective." State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Prejudice requires that "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 334-35. The court need not consider both deficiency and prejudice if a petitioner fails to prove one. In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012). We review ineffective assistance

of counsel claims de novo. State v. Lopez, 190 Wn.2d 104, 117, 410 P.3d 1117 (2018).

For ineffective assistance claims based on a failure to take a certain action, the defendant must show that the action would have likely been successful. See State v. Emery, 174 Wn.2d at 755 (prejudice established if defendant can show a competent attorney would have moved for severance, the motion likely would have been granted, and "that there is reasonable probability he would have been acquitted at a separate trial"); State v. D.E.D., 200 Wn. App. 484, 490, 402 P.3d 851 (2017) (reasoning that "in the context of the failure to bring a motion to suppress, counsel can only have been ineffective if it can be shown that the motion likely would have been granted").

"Washington courts have long held that to admit evidence suggesting another person committed the charged offense, the defendant must lay a foundation; that is, [they] must establish a train of facts or circumstances as tend clearly to point out someone besides the defendant as the guilty party." State v. Strizheus, 163 Wn. App. 820, 830, 262 P.3d 100 (2011). "[T]he threshold analysis for 'other suspect' evidence involves a straightforward, but focused, relevance inquiry, reviewing the evidence's materiality and probative value for 'whether the evidence has a logical connection to the crime.' " State v. Ortuño-Perez, 196 Wn. App. 771, 783, 385 P.3d 218 (2016) (quoting State v. Franklin, 180 Wn.2d 371, 381-82, 325 P.3d 159 (2014)). "Evidence is relevant when it is both material—the fact to be proved 'is of consequence in the context of the other facts and the applicable substantive law'—and probative—the evidence has a

'tendency to prove or disprove a fact.' " Ortuño-Perez, 196 Wn. App. 784 (quoting State v. Sargent, 40 Wn. App. 340, 348 n.3, 698 P.2d 598 (1985)).

This inquiry focuses on whether the evidence at issue tends to create a reasonable doubt regarding the defendant's guilt; the evidence need not establish the other suspect's guilt beyond a reasonable doubt. Franklin, 180 Wn.2d at 381. "[I]f there is an adequate nexus between the alleged other suspect and the crime, such evidence should be admitted." Id. at 373. However, "[e]vidence establishing nothing more than suspicion that another person might have committed the crime [is] inadmissible." Id. at 380. Thus, " '[m]ere evidence of motive in another party, or motive coupled with threats of such other person, is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged.' " Id. at 379 (quoting State v. Kwan, 174 Wash. 528, 533, 25 P.2d 104 (1933)). Further, " '[r]emote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose.' " Franklin, 180 Wn.2d at 380 (quoting Kwan, 174 Wash. at 533). We review a trial court's exclusion of "other suspect" evidence for an abuse of discretion. Ortuño-Perez, 196 Wn. App. at 783.

Kozma contends that "he was prevented from arguing that the evidence showed that someone else at the scene was the killer, and so his general denial defense was essentially reduced to arguing" that the State did not prove he was the shooter. He relies on Ortuño-Perez, 196 Wn. App. at 791, to support his argument that the court improperly excluded this "other suspect" testimony. But Ortuño-Perez is distinguishable.

In Ortuño-Perez, the defendant was convicted of murder in the second degree for shooting the victim while the victim stood outside his home. 196 Wn. App. at 774, 776.

16

When the shot was fired, between 5-12 people were standing near the victim. Id. at 776. Two in the group were identified as armed with a handgun: Agnish and the defendant. Id. The defendant sought to introduce a variety of evidence indicating that Agnish was the shooter, including but not limited to the fact that he was in the crowd when the victim was shot, that he was armed, that he owned multiple other guns, and that he belonged to a gang and believed the victim belonged to an opposing gang. Id. at 786-88. The trial court denied the request, reasoning that the defendant had not demonstrated that Agnish took steps to commit the crime. Id. at 776-77. The trial court further suggested that the defendant was precluded from "pointing the finger at somebody"—i.e., from "arguing or postulating that anyone else at the scene of the crime could have committed the crime." Id. at 790-91.

This court disagreed. Id. at 791. First, it reasoned that the evidence proffered by the defendant relating to Agnish's culpability "was of a type that tended to logically connect Agnish to [the victim's] murder." Id. Indeed, "[i]f credited by the jury, it would establish Agnish's motive (a gang clash), his opportunity (he was present at the murder scene and in close proximity to [the victim] at the instant of the shooting, and his means (he was armed with a handgun)." Id. Thus, "the evidence proffered was plainly relevant to the question of the identity of [the victim's] murderer and was the type that . . . would support a reasonable doubt as to the [defendant's] guilt." Id. Additionally, this court held that the trial court erred by restricting argument that someone else committed the crime, as "a defense of general denial is, of logical necessity, a defense that 'someone else did it.' " Id.

17

Here, Kozma sought to recall Hobart to testify about James's allegedly abusive relationship around the time of the shooting. He sought to ask not what was said but "what [Hobart's] understanding was of the circumstances," based on a pretrial interview in which Hobart shared that he saw bruises on James when she first arrived at his home and that James had made comments to him about it while they spent time together.

But unlike the extensive evidence presented in Ortuño-Perez that tended to logically connect the other suspect to the crime, here, at most, the proffered testimony suggested only that James may have been in an abusive relationship. Kozma argues that Hobart's testimony would support the inference that not only was there an abusive boyfriend, but that this person found James at Hobart's house, shot her in the back, and then fled, potentially in the unidentified vehicle Hobart heard in the area following the shooting. This mere inference that another person had motive to shoot James is inadmissible without other evidence to connect the other person with the commission of the crime. Here, there was no evidence linking a supposedly abusive boyfriend to the shooting, and James denied having a partner. Thus, even if Kozma's counsel had sought to introduce Hobart's testimony about James's alleged abusive relationship as "other suspect" evidence, the motion would have been unsuccessful, as the evidence established "nothing more than suspicion" that someone else might have committed the crime. Franklin, 180 Wn.2d at 373. Kozma's counsel acted reasonably in declining to pursue Hobart's testimony under this theory. Because Kozma cannot show that his counsel's performance was deficient, his ineffective assistance claim fails.

III.  Cumulative Error

Kozma argues that the combination of errors, both constitutional and evidentiary, deprived him of a fair trial and is thus grounds for reversal. "The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial, even where any one of the errors, taken individually, may not justify reversal." In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). Because there were no trial errors, Kozma was not deprived of a fair trial under the cumulative error doctrine.

IV.  SAG

In his SAG, Kozma argues three additional errors relating to inconsistencies in James's testimony. First, Kozma discusses testimony concerning James's identification of him in a photo montage a few days after the shooting. The officer who performed the montage testified, and on cross-examination, she acknowledged that in the audio recording of the process, it sounded as if James said "Miguel" when she pointed to Kozma's picture. Because Kozma's claim of error fails to "inform the court of the nature and occurrence of alleged errors" when discussing these portions of the record, we decline to review the issue pursuant to RAP 10.10(c).

Second, Kozma points to James's testimony on cross-examination that she could not recall whether on the day she was shot she had two pipes on her person. Prior to her testimony, officers testified that they found two glass pipes "used to . . . smoke narcotics" in her pockets. Therefore, Kozma asserts James lied. But again, it is unclear on what basis Kozma claims error. To the extent the apparent inconsistency concerns James's credibility, that issue is left to the trier of fact. State v. Myers, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997) ("Credibility determinations are within the sole province of the

jury and are not subject to review."). Additionally, Kozma's counsel did elicit this information from James on cross-examination and argued in closing that James's testimony was not credible partially due to this inconsistency.

Third, Kozma alleges error relating to James's testimony concerning how she knew him. During additional voir dire of James prior to her testimony to explore "the extent to which the State may ask questions on redirect related to [James's] understanding of the relationship between her sister and [Kozma]," Kozma asked her about his relationship with her sister. She shared that they were together around "2016, 2017," and that Kozma was abusive towards her sister. The purpose of this questioning was to determine "the extent to which the State may ask questions on redirect related to [James's] understanding of the relationship between her sister and [Kozma]." But the only testimony the jury heard was about Kozma's previous relationship with James's sister and James's general dislike of Kozma. Again, because Kozma's argument does not inform this court of the nature of the alleged error relating to James's testimony on this issue, we decline to review the issue. RAP 10.10(c).

CONCLUSION

We affirm.

_____
Chung, J.

WE CONCUR:


_____, ACJ          _____